CITY RECYCLING, INC. *v.* STATE OF
CONNECTICUT ET AL.
(SC 16418)

Sullivan, C. J., and Borden, Norcott, Palmer and Vertefeuille, Js.

430

Argued April 25—officially released August 14, 2001

*Alan Neigher*, with whom were *Judith M. Trutt* and, on the brief, *William E. Strada, Jr.*, for the appellant (plaintiff).

*Richard F. Webb*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellees (defendants).

*Opinion*

BORDEN, J. The dispositive issue in this reservation is whether General Statutes (Rev. to 1997) § 22a-208a (a), as amended by No. 97-300, § 2, of the 1997 Public Acts (P.A. 97-300),[1] and as applied to the plaintiff, City Recycling, Inc., violates its equal protection rights. Section 22a-208a (a), as amended by P.A. 97-300, § 2, prohibits the commissioner of the department of environmental protection (department) from approving, for a city with a population of greater than 100,000, the

---

[1] General Statutes (Rev. to 1997) § 22a-208a (a), as amended by No. 97-300, § 2, of the 1997 Public Acts, provides in relevant part: "(a) The Commissioner of Environmental Protection may issue, deny, modify, renew, suspend, revoke or transfer a permit, under such conditions as he may prescribe and upon submission of such information as he may require, for the construction, alteration and operation of solid waste facilities, in accordance with the provisions of this chapter and regulations adopted pursuant to this chapter. . . . The commissioner shall not authorize under a general permit or issue an individual permit under this section to establish or construct a new volume reduction plant or transfer station located, or proposed to be located, within one-quarter mile of a child day care center, as defined in subdivision (1) of subsection (a) of section 19a-77, in a municipality with a population greater than one hundred thousand persons provided such center is operating as of [July 8, 1997]. The commissioner may modify or renew a permit for an existing volume reduction plant or transfer station, in accordance with the provisions of this chapter, without regard to its location. . . ."

establishment or construction of "a new volume reduction plant or transfer station located, or proposed to be located, within one-quarter mile of a child day care center . . . ."[2] The statute also excepts from its purview existing volume reduction facilities and transfer stations without regard to their location. This case returns to us after the trial court, on remand from this court in a prior reservation for advice, made numerous factual findings, most significantly, "that the proposed expansion [by the plaintiff] of its facility presents no reasonable possibility of environmental hazards." We conclude that the statute in question violates the plaintiff's equal protection rights.

The plaintiff originally brought this action for a declaratory judgment claiming that the defendants, the state of Connecticut and Sidney Holbrook, the commissioner of the department (commissioner),[3] improperly had refused to process the plaintiff's application to expand its existing recycling facility in Stamford in order to operate a volume reduction facility for non-toxic materials. The department had informed the plaintiff that it could not process its application because of the passage of P.A. 97-300, § 2. The plaintiff claimed that § 22a-208a (a), as amended by P.A. 97-300, § 2, violated its rights to due process under article first, § 8,[4] of the Connecticut constitution, and its rights to equal protection of the law under article first, §§ 1 and 20,[5]

---

[2] Prior to the 1997 amendment, General Statutes (Rev. to 1997) § 22a-208a (a) afforded the commissioner of the department the discretion to issue permits for such volume reduction facilities.

[3] For the sake of convenience, we will refer to the defendants jointly as the department. The record reflects no interest of the state of Connecticut other than that of the department.

[4] Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

[5] Article first, § 1, of the Connecticut constitution provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community."

Article first, § 20, of the Connecticut constitution, as amended by articles

of the Connecticut constitution. Pursuant to Practice Book § 73-1,[6] the parties agreed upon a stipulation of facts and filed a joint petition with the trial court, which granted the petition, for a reservation of the plaintiff's constitutional challenges to § 22a-208a (a), as amended by P.A. 97-300, § 2. In that reservation, we concluded that there was an insufficient factual basis to determine whether the plaintiff had suffered any constitutional deprivation. *City Recycling, Inc.* v. *State*, 247 Conn. 751, 762, 725 A.2d 937 (1999). In that connection, we

five and twenty-one of the amendments, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

[6] Practice Book § 73-1 provides in relevant part: "(a) Any reservation shall be taken to the supreme court or to the appellate court from those cases in which an appeal could have been taken directly to the supreme court, or to the appellate court, respectively, had judgment been rendered. Reservations in cases where the proper court for the appeal cannot be determined prior to judgment shall be taken directly to the supreme court.

"(b) All questions presented for advice shall be specific and shall be phrased so as to require a Yes or No answer.

"(c) Before any question shall be reserved by any court, counsel shall file in that court a stipulation which shall clearly and fully state the question or questions upon which advice is desired; that their present determination by the appellate court having jurisdiction would be in the interest of simplicity, directness and economy in judicial action, the grounds for such allegation being particularly stated; that the answers to the questions will determine, or are reasonably certain to enter into the final determination of the case; and that the parties request that the questions be reserved for the advice of the appellate court having jurisdiction. The stipulation shall also designate the specific pleadings in the trial court case file which are necessary for the presentation of the question or questions sought to be reserved and shall state the undisputed facts which are essential for determination of the question or questions sought to be reserved. With the stipulation the parties shall file a joint docketing statement in the format specified in Section 63-4 (a) (4) for regular appeals. . . .

"(e) The court will not entertain a reservation for its advice upon questions of law arising in any action unless the question or questions presented are such as are, in the opinion of the court, reasonably certain to enter into the decision of the case, and it appears that their present determination would be in the interest of simplicity, directness and economy of judicial action. . . ."

stated: "Although other omissions from the stipulation are of interest, the most significant is the absence of any stipulated fact that the plaintiff's proposed expansion poses no reasonable possibility of environmental hazards." Id., 760. Accordingly, we remanded the case to the trial court to allow the plaintiff to develop a sufficient factual basis to support its constitutional claims. Id., 762.

Upon that remand, after a full evidentiary hearing the trial court found the following facts. In 1987, the state of Connecticut mandated recycling in its solid waste management plan and placed the burden on private refuse companies to remove recyclables from the waste stream. The list of recyclables initially included bottles, cans, plastics, office paper and corrugated paper, but subsequently was expanded to include construction and demolition materials, which must be separated from general garbage at the source, and sorted out by type at a volume reduction facility.[7]

When the plaintiff, a corporation engaged in the waste management and disposal business, began its operation in Stamford,[8] it initially handled only paper products. By late 1994, the plaintiff was running out of space at its original site. In January, 1995, the plaintiff purchased, without any local opposition, its current facility at 61 Taylor Reed Place in Stamford. The plaintiff selected the site, which previously had been used as a manufacturing plant for a boiler company, because it covered two and one-half acres, bordered on a railroad track, and had a 30,000 square foot building and truck access off Route 106, a state highway within one mile of Interstate 95.

---

[7] A volume reduction facility is one where recyclables are sorted, bailed or processed.

[8] The city of Stamford, as well as four other Connecticut cities, has a population that exceeds 100,000.

Located nearby on Crescent Street is the Glenbrook Community Center (community center), which houses Activities for Kids, Inc., a child day care center (day care center), which is less than one-quarter of one mile away from the plaintiff's site. The community center is surrounded by the Sclafani Products Distribution Center and its trailers, as well as the Deluca Company yard and its trailers. The plaintiff's facility does not directly abut the community center, and trucks coming to and going from the plaintiff's facility do not travel on Crescent Street.

When the plaintiff acquired its current site, renovation was necessary in order for recycling activities to be performed inside the building. From March, 1995, through October, 1997, at a cost that exceeded $500,000, the current facility was renovated by the removal of two floors of office space, the construction of an open area, extensive masonry and structural support, the installation of loading docks, and drainage work, namely, the installation of sewers, a Vorteck floatables and sediment separator, and twenty-two galleys to keep storm water on the property.

At the time of the plaintiff's move to its current facility, construction debris constituted approximately 25 percent of its business. The plaintiff wanted to increase its capacity to handle construction debris and other nonhazardous recyclables in order to make up the cost of renovations. Concomitantly, the state was encouraging recyclers to process as many nonhazardous items as possible. In August, 1995, the plaintiff contacted the department to inquire about the application procedure for expanding its facility to become a volume reduction facility.[9] The department instructed the plaintiff that it

---

[9] The plaintiff's application was to operate a volume reduction facility that would not change the form of the items recycled, but would instead separate specific, nonhazardous items out of the waste stream for reuse.

needed permission from the local zoning authority before it could apply to the department.

In November, 1996, the plaintiff submitted building and drainage plans to the Stamford planning and zoning board (board), which included plans for drainage, sediment and erosion control. There were two notices in the local newspaper concerning the plaintiff's application, as well as two hearings before the board, which performed its own traffic studies of the plaintiff's application. In preparation for the hearing before the board, Michael Ferro and Anthony Terenzio, two of the plaintiff's corporate officers, visited all abutting neighbors to explain the plaintiff's plans and to ask whether any of them had concerns about the proposed expansion. None of the abutting neighbors had any concerns and all of them signed a petition in support of the plaintiff's application. The application was also supported by Jerry Pia, the executive director of the day care center.

At the time of the plaintiff's submission of its application to the board, the plaintiff had the right to operate twenty-four hours a day, there were no limits on the number of trucks that could enter the facility on a daily basis, and there was no limit on the number of tons of paper that could be delivered or sent out each day. The board approved the plaintiff's application in December, 1996, and in granting the approval, placed certain conditions upon the plaintiff's operation, including: (1) hours of operation were to be limited to 6 a.m. through 8 p.m. Monday through Saturday; (2) all work was to be done inside the facility; (3) truck access was to continue to be restricted to Taylor Reed Place; (4) waste oil and storage batteries could not be handled by the facility; and (5) no pulverizers, grinders or any machinery that would change the form of the material accepted by the facility would be allowed. The recycling process would be done only by hand sorters, operating inside the build-

ing, and the materials would then be sent to reprocessors without any change in their form.

After securing the approval of the board, the plaintiff met with the department to discuss the procedure for applying for an expanded permit. The plaintiff reviewed several department applications and was impressed by the applications prepared by Anchor Engineering Services, Inc., which the plaintiff hired to prepare its application. The application and the $9500 application fee were submitted to the department in March, 1997. After the first phase of the department's review, which took approximately thirty days, the plaintiff was notified that its application was complete. The second phase of the department's review, which is a technical review of the application, required the plaintiff to publish a notice of its permit application in a local newspaper in accordance with a form provided by the department, which the plaintiff followed. The form required, among other things, that the plaintiff identify any watershed that might be affected by the expansion. The notice that the plaintiff submitted stated: "The facility is designed to process a total of 300 tons per day of construction and demolition debris, land clearing debris, pallets, clean wood, paper and cardboard, commingled containers, scrap metal and tires. The proposed activity will take place at 61 Taylor Reed Place, Stamford, Connecticut. The proposed activity will potentially affect: [t]he Noroton River; on-site land and groundwater." The plaintiff did not believe, however, that the facility actually would impact the Noroton River, on-site land or groundwater because of the drainage and erosion measures that it previously had taken. Furthermore, no water typically discharges from the plaintiff's property, and the plaintiff has never received a citation, warning or notice that it has polluted water.

In April, 1997, several members of the Stamford legislative delegation sent a letter to the commissioner,

requesting that the commissioner not issue the plaintiff any permits for the expansion until a public hearing were held. The trial court found that, contrary to certain statements made in that letter, the plaintiff's facility does not border either the community center or any condominiums, the plaintiff's facility does not have any adverse environmental effect on the children at the day care center or on anyone who lives near the site, and the facility will not adversely affect the Noroton River because the plaintiff has taken all required steps to control any drainage from the property.

Prior to any public hearing on the application, Ferro, in early June, 1997, received a call from a lobbyist, who told him that the plaintiff's application was threatened by proposed legislation. The lobbyist called the next day to say that the plaintiff's application would not be processed because of the passage of P.A. 97-300. After being advised of the passage of the legislation, the plaintiff called the department, which later notified the plaintiff that its application could not be processed because of P.A. 97-300.[10]

The trial court further found the following facts that relate specifically to the effect on public health and safety of the plaintiff's present facility. The plaintiff's facility has no adverse affect on public health or safety. First, with respect to truck traffic, trucks coming to and going from the plaintiff's facility do not go onto Crescent Street, which is a commercial street, where the community center is located, and they have no impact on children going to the day care center. The children are preschoolers who do not walk to the community center, but who are dropped off in front of the building. Because the area is zoned for industrial use,

[10] The parties stipulated that as of December, 1997, the plaintiff's permit application was the only one affected by P.A. 97-300. The parties also stipulated that the department did not seek the enactment of § 22a-208a (a), as amended by P.A. 97-300, § 2.

there is established truck traffic in the area, including uses by neighboring facilities. Second, the plaintiff has not been fined since beginning its operations. Although the plaintiff received one warning for leaving a container uncovered for one night, the problem promptly was addressed and resolved. When material is tipped onto the floor within the plaintiff's building, it is examined for any possibly contaminated containers; if any are found, they are pulled out and treated as regular garbage. Third, fire has never been a problem in the past even though the plaintiff processes tons of paper each day. Furthermore, there are extensive fire protection and prevention procedures and precautions in place.

The trial court also found the following facts that relate specifically to the effect of the proposed facility on public health and safety. First, with respect to truck traffic, the plaintiff's application to the department shows that trucks going to the plaintiff's facility would continue to avoid Crescent Street. Moreover, in this kind of volume reduction facility, truck traffic tends to be spread out over the course of the day rather than being concentrated. Second, with respect to any fire hazards, although some of the materials to be received by the plaintiff may be combustible, the application provides for fire and emergency precautions. Third, with respect to groundwater, the proposed facility would not pose a groundwater problem because all processing occurs inside. The loads that come into and that leave from the facility are covered, and would have no contact with rain water. Furthermore, the plaintiff already has installed a separator for sediment and floatables inside its building with a galley system, and there would be no water runoff from the building.

Fourth, because the local building codes require that asbestos and lead be removed prior to the granting of a demolition permit, friable asbestos, which is asbestos

that can flake and become airborne, is not a concern. If asbestos and lead did reach the plaintiff's facility, however, there are procedures to handle their disposal. Although it is theoretically possible that, if the plaintiff accepts a load that contains asbestos and a fire breaks out and goes out of control, airborne traces of toxic elements may be released, the plaintiff has never received any asbestos materials. If it did, however, it would immediately call in a licensed remover.

Fifth, a volume reduction facility such as the plaintiff's proposed project is allowed to receive in its load 10 percent residue, or nonrecyclables, which must be removed within twenty-four hours. When the plaintiff receives nonrecyclable items, those items are separated out and properly disposed of in accordance with the department's and Stamford's regulations. There are no barrels of residue material that remain at the plaintiff's facility. The plaintiff removes both recyclables and residue on a daily basis.

Sixth, dust and airborne debris would not create any hazard. Any possible dust would be caused by vehicles going over the paved site, but not by the processing, which occurs inside. Because there could be no changes to the form of the materials received by the proposed facility, there should be no dust. Seventh, waste oil and batteries would not be accepted by the plaintiff under the certificate granted to it by the board. In accordance with the state's policy to have these items recycled rather than placed into general garbage, there are other facilities that accept these items. Eighth, from the outside, the operations would not appear any different except that the building would seem larger. Ninth, noise from the plaintiff's proposed facility would not increase the overall noise level, because all of the operations occur inside, the opening in the building faces the railroad tracks, which already generate noise, and the neighboring facilities also generate noise. Finally, mate-

rials that would be received by the plaintiff would neither attract nor sustain pests.

With respect to the permitting process, the trial court found the following facts. The department requires local approval of any proposed facility before it considers an application, relying on municipalities to weed out unwanted facilities. Relatedly, prior to the passage of P.A. 97-300, there had never been any state requirements regarding the location and siting of a volume reduction facility. Municipalities in which a volume reduction facility seeks to operate are generally concerned with nuisance issues, including dust, traffic, noise and odor. The department exercises less discretion in awarding a permit than do local zoning boards because the state's regulations are very specific and the state has well developed guidelines concerning potential problems. If a permit meets the state's requirement, it will be granted unless the applicant has a poor compliance history. Local zoning boards often have no written guidelines for volume reduction facilities. Although the purpose of a hearing is to address the concerns of the public, the fact that there are concerns does not mean a permit will not be granted; instead, the public's concerns may result in some conditions being placed upon the permit.

The trial court found further that, but for P.A. 97-300, § 2, it is highly probable that the plaintiff's application would have passed the department's technical review process, and that the plaintiff would have received a permit from the department to operate in its present location as a multiproduct, nonhazardous recycler of paper, wood, construction and land clearing debris. There is an excellent fit between the plaintiff's current operation and its proposed expansion because the plaintiff already has in place a scale for tracking materials and a large building, it is adjacent to railroad tracks, it is close to Interstate 95 and a state highway, it has

industrial neighbors, and it has a zoning permit in place from the board. The plaintiff's application closely resembles the applications for volume reduction facilities that have been granted by the department and are now in operation. The plaintiff's proposed volume reduction facility would create fewer problems than other volume reduction facilities that operate outside of a closed building, and would pose the same level of danger as other existing facilities that operate inside. The department historically has been able to address environmental problems as they arise by effectively monitoring conditions and ordering remedial action with respect to the state's volume reduction facilities.

Finally, and most significantly, the trial court found that safety issues posed by a volume reduction facility do not vary with the size of the municipality in which the facility is located or with its proximity to day care centers. Additionally, the trial court found that the defendants offered no evidence that the plaintiff's application for the subject volume reduction facility presented a reasonable possibility of environmental hazards. Similarly, the defendants presented no evidence that the plaintiff's proposed expansion presented any increased possibility of environmental hazards in comparison to any of the existing volume reduction facilities now operating in Connecticut.

Thereafter, pursuant to Practice Book § 73-1, the parties again jointly petitioned the trial court for a reservation of the plaintiff's constitutional challenges to § 22a-208a (a), as amended by P.A. 97-300. The trial court subsequently reserved the following questions for the advice of this court: (1) "As applied to the facts of record, does § 22(a)-208a[11] of the Connecticut General Statutes, as amended by P.A. 97-300, § 2, violate the

---

[11] It is obvious that the references in the reserved questions to § 22(a)-208a are merely typographical errors, and should read § 22a-208a.

plaintiff's right to due process of law guaranteed by Article First, § 8 of the Connecticut Constitution?," and (2) "As applied to the facts of record, does § 22(a)-208a of the Connecticut General Statutes, as amended by P.A. 97-300, § 2, violate the plaintiff's rights to equal protection of the law guaranteed by Article First, §§ 1 and 20 of the Connecticut Constitution?" Under our resolution of the case, it is unnecessary to answer the first question. We answer the second question in the affirmative.

The plaintiff claims that P.A. 97-300, § 2, either on its face or as applied, violates its right to equal protection as guaranteed by the constitution of Connecticut, article first, § 1, and article first, § 20, as amended by articles five and twenty-one of the amendments, by creating classifications unrelated to a legitimate state interest. Specifically, the plaintiff argues that the legislative history of P.A. 97-300, § 2, demonstrates that the sole purpose of the legislation was to prevent the plaintiff from building a volume reduction facility. The plaintiff also argues that the legislation does not further the state's ability to protect its citizens from environmental hazards. The plaintiff argues, in the alternative, that P.A. 97-300, § 2, is unconstitutional because it violates the prohibition against exclusive public emoluments or privileges under article first, § 1, of the Connecticut constitution. The department argues, to the contrary, that the plaintiff has not established that it has a constitutionally protected property interest that is impacted adversely by P.A. 97-300, § 2. The department further argues that P.A. 97-300, § 2, is rationally related to a legitimate state interest and, therefore, survives the plaintiff's equal protection challenge. We conclude that P.A. 97-300, § 2, is not rationally related to any legitimate state interest and, therefore, we conclude that P.A. 97-300, § 2, is unconstitutional as applied to the plaintiff.

As a threshold matter, we address the particular analytical framework that the plaintiff would have us undertake. The plaintiff relies solely on the Connecticut constitution and urges us to employ the analysis in *State v. Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), suggesting that the equal protection provision under the Connecticut constitution affords greater protection than its federal counterpart.[12] Although we previously have stated that the equal protection provision under our state constitution provides the same limitations as the federal equal protection provision; see, e.g., *Daily v. New Britain Machine Co.*, 200 Conn. 562, 577, 512 A.2d 893 (1986); we note here, as we did in, for example, *Barton v. Ducci Electrical Contractors, Inc.*, 248 Conn. 793, 812–13 n.15, 730 A.2d 1149 (1999), that this does not mean that "the state equal protection provision can *never* have an independent meaning from the equal protection provision in the federal constitution . . . ." (Emphasis in original.) See also, e.g., *Ramos v. Vernon*, 254 Conn. 799, 827–28, 761 A.2d 705 (2000). Before undertaking a *Geisler* analysis, however, we ordinarily would conclude, as a necessary predicate, that P.A. 97-300, § 2, could withstand scrutiny under traditional equal protection analysis. See *Barton v. Ducci Electrical Contractors, Inc.*, supra, 812–19; see also *Ramos v. Vernon*, supra, 817–18. Because we conclude that P.A. 97-300, § 2, fails under traditional federal and state equal protection principles, it is unnecessary to consider whether, under *Geisler*, the state equal protection provision affords greater protection in this situation than the federal equal protection provision.

---

[12] In *State v. Geisler*, supra, 222 Conn. 684–86, we enumerated the following six factors to be considered in determining that issue: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies. See *State v. Diaz*, 226 Conn. 514, 530–31, 540, 628 A.2d 567 (1993).

The parties agree, as do we, that the constitutionality of P.A. 97-300, § 2, must be gauged under the rational basis test. See, e.g., *Fulton Corp.* v. *Faulkner*, 516 U.S. 325, 345, 116 S. Ct. 848, 133 L. Ed. 2d 796 (1996) (rational basis test as measure of equal protection of economic legislation); *Stafford Higgins Industries, Inc.* v. *Norwalk*, 245 Conn. 551, 567, 715 A.2d 46 (1998) (same); *D.A. Pincus & Co.* v. *Meehan*, 235 Conn. 865, 879, 670 A.2d 1278 (1996) (same). "In the context of an equal protection challenge to social and economic legislation that does not infringe upon a fundamental right or affect a suspect group, the classification drawn by the statute will not violate the equal protection clause if it is rationally related to a legitimate public interest. *Nordlinger* v. *Hahn*, 505 U.S. 1, 8, 112 S. Ct. 2326, 120 L. Ed. 2d 1 (1992); *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U.S. 432, 439–41, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). . . .

"The United States Supreme Court has recently summarized the rational basis test as applied to social and economic legislation that does not infringe upon a fundamental right or affect a suspect group. *Nordlinger* v. *Hahn*, supra, [505 U.S. 11–12]. In general, the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, see *United States Railroad Retirement Board* v. *Fritz*, 449 U.S. 166, 174, 179 [101 S. Ct. 453, 66 L. Ed. 2d 368 (1980), reh. denied, 450 U.S. 960, 101 S. Ct. 1421, 67 L. Ed. 2d 385 (1981)], the legislative facts on which the classification is apparently based rationally may have been considered to be true by the government decisionmaker, see *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U.S. 456, 464 [101 S. Ct. 715, 66 L. Ed. 2d 659, reh. denied, 450 U.S. 1027, 101 S. Ct. 1735, 68 L. Ed. 2d 222] (1981), and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational, see *Cleburne* v. *Cleburne Living Center*,

*Inc.,* [supra, 473 U.S. 446]. *Nordlinger* v. *Hahn,* supra, [11]." (Internal quotation marks omitted.) *Stafford Higgins Industries, Inc.* v. *Norwalk,* supra, 245 Conn. 567–68. "A statutory classification fails rational-basis review only when it rests on grounds wholly irrelevant to the achievement of the State's objective. *Holt Civic Club* v. *Tuscaloosa,* 439 U.S. 60, 71 [99 S. Ct. 383, 58 L. Ed. 2d 292] (1978) . . . ." (Citation omitted; internal quotation marks omitted.) *Heller* v. *Doe,* 509 U.S. 312, 324, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993).

"Therefore, the presumption of constitutionality can be overcome only by the most explicit demonstration that the classification is a hostile and oppressive discrimination against particular persons and classes. The burden is on the one attacking the legislative arrangement to negative *every conceivable basis* which might support it. . . . *Miller* v. *Heffernan,* 173 Conn. 506, 509–10, 378 A.2d 572 (1977), appeal dismissed, 434 U.S. 1057, 98 S. Ct. 1226, 55 L. Ed. 2d 758 (1978). . . . *Johnson* v. *Meehan,* 225 Conn. 528, 535–37, 626 A.2d 244 (1993)." (Emphasis in original; internal quotation marks omitted.) *Stafford Higgins Industries, Inc.* v. *Norwalk,* supra, 245 Conn. 569.

We highlight a case, which recently was decided by the United States Supreme Court, that is particularly relevant to the present case. In *Willowbrook* v. *Olech,* 528 U.S. 562, 563, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000), the respondent sought to have her property connected to the municipal water supply. The town conditioned the connection on the respondent's grant to the town of a thirty-three foot easement, although other property owners were required to grant only a fifteen foot easement. Id. After a three month delay, the town agreed to provide water service to the respondent with a fifteen foot easement. Id. The respondent brought an action against the town, claiming that the town's demand of an additional eighteen foot easement: vio-

lated her equal protection rights under the federal equal protection provision; was irrational and wholly arbitrary; was motivated by ill will that resulted from the respondent's prior filing of an unrelated, successful lawsuit against the town; and was made in reckless disregard of or with the intent to deprive her of her rights. Id. The federal District Court dismissed the action for failure to state a cognizable claim under the federal equal protection clause. Id. The United States Court of Appeals for the Seventh Circuit reversed the judgment of the District Court, holding that a plaintiff has a cognizable equal protection claim "by asserting that state action was motivated solely by a spiteful effort to get him for reasons wholly unrelated to any legitimate state objective." (Internal quotation marks omitted.) Id., 563–64. The United States Supreme Court affirmed the judgment of the Seventh Circuit, but based its conclusion on an alternative theory: "[The respondent's] complaint can fairly be construed as alleging that the [town] intentionally demanded a 33-foot easement as a condition of connecting her property to the municipal water supply where the [town] required only a 15-foot easement from other similarly situated property owners. . . . The complaint also alleged that the [town's] demand was 'irrational and wholly arbitrary' and that the [town] ultimately connected her property after receiving a clearly adequate 15-foot easement. These allegations, quite apart from the [town's] subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis." (Citation omitted.) Id., 565; but cf. *Thomas* v. *West Haven*, 249 Conn. 385, 734 A.2d 535 (1999), cert. denied, 528 U.S. 1187, 120 S. Ct. 1239, 146 L. Ed. 2d 99 (2000).

The Supreme Court reasoned that it has "recognized successful equal protection claims brought by a class of one, where the plaintiff alleges that she has been intentionally treated differently from others similarly

situated and that there is no rational basis for the difference in treatment. See *Sioux City Bridge Co.* v. *Dakota County*, 260 U.S. 441 [43 S. Ct. 190, 67 L. Ed. 2d 340] (1923); *Allegheny Pittsburgh Coal Co.* v. *Commission of Webster [County]*, 488 U.S. 336 [109 S. Ct. 633, 102 L. Ed. 2d 688] (1989). In so doing, [the court has] explained that [t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents. *Sioux City Bridge Co.* [v. *Dakota County*, supra, 445] (quoting *Sunday Lake Iron Co.* v. *Township of Wakefield*, 247 U.S. 350, 352 [38 S. Ct. 495, 62 L. Ed. 1154 (1918)]).'' (Internal quotation marks omitted.) *Willowbrook* v. *Olech*, supra, 528 U.S. 564; see also id., 564 n.* ("the number of individuals in a class is immaterial for equal protection analysis").

"[T]o implicate the equal protection [clause] . . . it is necessary that the state statute [or statutory scheme] in question, either on its face or in practice, treat persons standing in the same relation to it differently. . . . Thus, the analytical predicate [of consideration of an equal protection claim] is a determination of who are the persons similarly situated." (Citation omitted; internal quotation marks omitted.) *State* v. *Jason B.*, 248 Conn. 543, 558–59, 729 A.2d 760, cert. denied, 528 U.S. 967, 120 S. Ct. 406, 145 L. Ed. 2d 316 (1999).

We noted, in *Thomas* v. *West Haven*, supra, 249 Conn. 400, that "selective enforcement is a murky [area] of equal protection law in which there are surprisingly few cases . . . ." (Citation omitted; internal quotation marks omitted.) We also noted that "the 'similarly situated' requirement in an action involving an alleged equal protection violation based on selective treatment" is troublesome. Id. The present case is even more unusual because the plaintiff claims, among other things, that

particular legislation was, not selectively applied to the plaintiff, but solely enacted because of, and so narrowly drafted to apply solely to, the plaintiff. In the present case, where the plaintiff has proven that certain legislation was enacted because of and specifically aimed at the plaintiff, we deem the similarly situated requirement to be satisfied.

Under the principles of our equal protection jurisprudence, we conclude that P.A. 97-300, § 2, is unconstitutional as applied, because it is violative of the plaintiff's equal protection rights.[13] The factual findings of the trial court negate any rational basis of which we can conceive, the most obvious of which is that the expansion of the plaintiff's facility would have some negative impact on children in the day care center located within one-quarter mile of the facility. The plaintiff's equal protection claim is particularly compelling in light of the legislative history of P.A. 97-300, § 2, which demonstrates that the legislation was aimed solely at the plaintiff's permit application.

First, the trial court expressly found, among other things, that: (1) "[t]here is nothing about proximity to a day care center, or the size of a municipality in which a volume reduction facility is located, that makes any difference in the safety of its operations"; and (2) the plaintiff's proposed expansion into a volume reduction facility posed *no* potential environmental hazards. Because we previously have set forth the extensive factual findings of the trial court, it is unnecessary to repeat that recitation here. Suffice it to say, these findings directly contradict and negate any rational basis of which we can conceive.

Second, the legislative history clearly demonstrates that the sole purpose of P.A. 97-300, § 2, was to prevent

---

[13] Because we conclude that the statute, as amended, is unconstitutional as applied, we need not address the plaintiff's facial challenge.

the plaintiff from building its proposed volume reduction facility. As the bill originally was presented to the House of Representatives, it contained no provision concerning the construction of a volume reduction facility near a child day care center. See Substitute House Bill No. 6516, 1997 Sess., Connecticut General Assembly. Instead, the bill solely concerned the commissioner's authority to perform background checks on applicants for environmental permits. Id. The House of Representatives subsequently amended the bill, which still contained no provision relating to volume reduction facilities near child day care centers. See House Amendment Schedules A and B to Substitute House Bill No. 6516, passed May 15 and 22, 1997; 40 H.R. Proc., Pt. 8, 1997 Sess., p. 2957; 40 H.R. Proc., Pt. 10, 1997 Sess., p. 3536. Thereafter, the Senate adopted an amendment, Senate Amendment Schedule A, which would have added the following provision to § 22a-208a (a): "The commissioner shall not issue or modify a permit under this section to construct or expand a volume reduction facility located, or proposed to be located, within one-quarter mile of a school or a facility offering child day care services, as defined in section 19a-77." Senate Amendment Schedule A to Substitute House Bill No. 6516, as amended by House Amendment Schedules A and B, passed May 30, 1997; 40 S. Proc., Pt. 10, 1997 Sess., p. 3383.

Senate Amendment Schedule A provoked opposition in the House of Representatives. During the legislative debate in the House, Representative Jessie Stratton summarized Senate Amendment Schedule A and stated: "This amendment very simply would prohibit the expansion or construction of a volume reduction facility within a quarter of a mile of a school or a day care center and I urge adoption of the amendment." 40 H.R. Proc., Pt. 16, 1997 Sess., p. 5840. When asked whether there was "some particular reason why we want to

have a prohibition here with regard to volume reduction facilities"; id., pp. 5840–41, remarks of Representative Richard O. Belden; Representative Stratton responded: "I would guess that the rationale is that [in] locations where there are a great number of children coming and going increasing the heavy truck traffic in such close proximity is probably not in the best interest of the safety of those other activities." Id., p. 5841. Immediately thereafter, Representative Belden, who was concerned about the potential financial setback that a change in law could have on someone who had made a significant investment in building a volume reduction facility, asked whether the legislation applied to a "specific instance . . . ." Id. Representative Stratton responded: (1) "[T]his would not affect an existing license. It would affect an expansion or a new license"; id., pp. 5841–42; and (2) *"I believe that it was prompted by a situation where these two situations [a volume reduction facility and a day care center] might be in position to each other in Stamford."* (Emphasis added.) Id., p. 5843; see also id., p. 5846.

On the basis of the financial setback the bill might cause to an existing volume reduction facility, Representative Belden and Representative G. Kenneth Bernhard rose in opposition to the Senate Amendment Schedule A. Id., pp. 5843–45. Representative Robert A. Maddox, Jr., also rose in opposition to Senate Amendment Schedule A, stating: "Here's an ideal situation where local control can determine whether or not this should occur . . . . I don't know what the specific fact situation happens to be down in Stamford or any where else, but I do know that the local planning and zoning commission of the Town of Stamford has control over this and if they determined that this was a bad idea, then I think they can regulate this . . . ." Id., pp. 5848–49.

The following day, the House of Representatives rejected Senate Amendment Schedule A and temporar-

ily passed House Amendment Schedule C to Substitute House Bill No. 6516. 40 H.R. Proc., Pt. 17, 1997 Sess., pp. 6487–88. House Amendment Schedule C provided in relevant part: "The commissioner shall not authorize under a general permit or issue an individual permit under this section to establish or construct a new volume reduction plant or transfer station located, or proposed to be located, within one-quarter mile of a child day care center, as defined in subdivision (1) of subsection (a) of section 19a-77, in a municipality with a population greater than one hundred thousand persons provided such center is operating as of the effective date of this section. The commissioner may modify or renew a permit for an existing volume reduction plant or transfer station, in accordance with the provisions of this chapter, without regard to its location." House Amendment Schedule C to Substitute House Bill No. 6516, as amended by House Amendment Schedules A and B, passed June 4, 1997; 40 H.R. Proc., Pt. 18, 1997 Sess., p. 6497. Referring to House Amendment Schedule C, Representative Stratton stated: "This amendment was redrafted after the appropriate discussion the other day *to make it apply only to a specific circumstance and to exclude its impact upon others* in terms of change of a solid waste facility to another use if such facility . . . is within a quarter mile of a day care center . . . ." (Emphasis added.) 40 H.R. Proc., Pt. 18, 1997 Sess., pp. 6495–96. The House of Representatives and the Senate subsequently passed the bill, as amended by House Amendment Schedule C. 40 H.R. Proc., Pt. 18, 1997 Sess., p. 6497; 40 S. Proc., Pt. 13, 1997 June Spec. Sess., pp. 4378, 4381. The legislative history convincingly demonstrates that P.A. 97-300, § 2, was aimed at "a specific circumstance" only, namely, preventing the plaintiff's proposed volume reduction facility.

Although rational basis review imposes a heavy burden and permits "an imperfect fit between means and

ends"; *Heller* v. *Doe*, supra, 509 U.S. 321; there is a limit to the hypothesizing that we will undertake in order to sustain the constitutionality of a statute. See id. ("even the standard of rationality . . . must find some footing in the realities of the subject addressed by the legislation"). The specific factual findings made by the trial court directly negate every conceivable rational basis for the legislation. Furthermore, this legislative history and record compel the conclusion that this legislation was aimed at this corporate citizen. These findings and this legislative record provide such a limit, and support the conclusion that the legislative action was arbitrary and without a rational basis. Consequently, we conclude that § 22a-208a (a), as amended by P.A. 97-300, § 2, is unconstitutional as applied to the plaintiff.

Our conclusion is consistent with our prior statement that "a state, consistent with the equal protection clause, may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. . . . The legislature may select one phase of one field and apply a remedy there, neglecting the others. . . . [T]he Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all." (Internal quotation marks omitted.) *Barton* v. *Ducci Electrical Contractors, Inc.*, supra, 248 Conn. 818–19; see also *Federal Communications Commission* v. *Beach Communications, Inc.*, 508 U.S. 307, 315–16, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993); cf. *Chotkowski* v. *State*, 240 Conn. 246, 259, 690 A.2d 368 (1997) ("[w]hat constitutes a public purpose is primarily a question for the legislature, and its determination should not be reversed by the court unless it is manifestly and palpably incorrect" [internal quotation marks omitted]). The liberty that the state enjoys, however, to address a problem in a piecemeal fashion does not encompass the liberty to target one entity and, with-

out a rational basis, enact legislation to prevent that entity from doing what it otherwise could lawfully do, in this case, present an application for fair consideration of its merits.

The department argues that the plaintiff cannot challenge the constitutionality of P.A. 97-300, § 2, because it has not articulated, nor shown a clear entitlement to, any constitutionally protected interest that P.A. 97-300, § 2, has impacted adversely. Specifically, the department argues that "[t]he only 'protected interest' which the plaintiff could assert would be a protected *property* interest in the future issuance of a permit from the [department] for its proposed [volume reduction facility]." (Emphasis in original.) The department relies on *Red Maple Properties* v. *Zoning Commission*, 222 Conn. 730, 739–42, 610 A.2d 1238 (1992), in which we employed a clear entitlement analysis and concluded that a land developer did not have a protected property interest in the issuance of a permit. As the department properly admits, however, *Red Maple Properties* and subsequent cases to which the department refers, namely, *Kelley Property Development, Inc.* v. *Lebanon*, 226 Conn. 314, 321–22, 627 A.2d 909 (1993), and *Wight* v. *Southington*, 43 Conn. App. 654, 657–58, 685 A.2d 686 (1996), which employed such an analysis, were *due process* claims brought under 42 U.S.C. § 1983. There is no similar doctrine requiring a plaintiff to show that it clearly was entitled to a protectable property interest in order to trigger the federal or state *equal protection* guarantees. Indeed, our decision in *Johnson* v. *Meehan*, 225 Conn. 528, 626 A.2d 244 (1993), implicitly belies such a doctrine, because it is doubtful that the inmate in that case could have established a protectable property interest in purchasing cigarettes without being subject to an excise tax. See *Kelley Property Development, Inc.* v. *Lebanon*, supra, 329 (no fourteenth amendment

protectable property interest where town agency has discretion to grant or deny).

The department also argues that P.A. 97-300, § 2, has a rational basis, namely, "protect[ing] the health and safety of children and their environment." Specifically, the department argues that "[i]t is conceivable that during those working hours, a volume reduction facility, such as the one proposed by the plaintiff, would likely be generating traffic (primarily trucks hauling waste), and could have potential environmental problems, including noise, odor, pest problems, and pollution." This argument fails, however, because the voluminous and specific factual findings of the trial court have "negat[ed] every conceivable basis which might support [the classification] . . . ." (Citation omitted; internal quotation marks omitted.) *Federal Communications Commission* v. *Beach Communications, Inc.*, supra, 508 U.S. 315.

At oral argument before this court, the department argued for the first time that the trial court's findings relating to a rational basis, or lack thereof, to support the statute are irrelevant and went beyond the scope of the remand. We decline to consider this argument because: (1) the department did nothing in the proceedings below to preserve such a claim; and (2) this issue was neither timely raised nor properly briefed. See *Lafayette* v. *General Dynamics Corp.*, 255 Conn. 762, 781, 770 A.2d 1 (2001).

With respect to the reserved questions: We decline to answer the first question; we answer the second question in the affirmative. The case is remanded for further proceedings according to law.

No costs will be taxed in this court to any party.

In this opinion the other justices concurred.