TOWN OF WALLINGFORD *v.* WALTER
WERBISKI ET AL.
(SC 17376)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

484

Argued April 11—officially released July 19, 2005

*Michael Brodinsky*, for the appellants (named defendant et al.).

*Janis M. Small*, town attorney, for the appellee (plaintiff).

*Opinion*

NORCOTT, J. The principal issue in this appeal is whether General Statutes § 7-148 (c) (6) (A) (iii)[1] permits a municipality to enter upon and to survey privately owned land to determine the feasibility of creating a "public improvement" on that land, when the survey would be for exploratory purposes only because the "public improvement" has not yet formally been planned or funded. The defendants, Walter Werbiski and Joyce Werbiski,[2] appeal[3] from the judgment of the trial court granting the application of the plaintiff, the town of Wallingford (town), for a permanent injunction permitting the town's representatives to access the defendants' property for the purpose of conducting a

---

[1] General Statutes § 7-148 (c) provides in relevant part: "Any municipality shall have the power to do any of the following, in addition to all powers granted to municipalities under the Constitution and general statutes . . .

"(6) Public works, sewers, highway. (A) Public facilities. . . .

"(iii) Enter into or upon any land for the purpose of making necessary surveys or mapping in connection with any public improvement, and take by eminent domain any lands, rights, easements, privileges, franchises or structures which are necessary for the purpose of establishing, constructing or maintaining any public work, or for any municipal purpose, in the manner prescribed by the general statutes . . . ."

[2] Peter Werbiski, a co-owner of property in Wallingford, also was named as a defendant. Since the commencement of this action, Peter Werbiski consented to the town's application, and he has not participated in this appeal. Hereafter, references in this opinion to the defendants are to Walter Werbiski and Joyce Werbiski.

[3] The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

land and wetlands survey. On appeal, the defendants contend that the trial court improperly: (1) construed § 7-148 (c) (6) (A) (iii); and (2) concluded that the town either did not need to plead or to prove, or in any event had established, the irreparable harm necessary for the issuance of an injunction. We affirm the judgment of the trial court.

The record reveals the following undisputed relevant facts and procedural history. In January, 2003, the town council voted to fund and authorize the town engineer, John Thompson, to study and to report on the potential for developing 270 acres of privately owned farmland that is located in a part of the town that is zoned for industrial expansion. The area presently is not served by roads or utilities, and Thompson proposed to study the feasibility of constructing roads and utilities such as water, gas, electric and telephone services therein in connection with the possible expansion of an industrial park that is located adjacent thereto. This study would require surveyors to enter upon, and to survey and map the property in order to gather necessary data about the topography of the land. The defendants own two parcels of real property located within this area that are used as working farms for the farming of hay and corn for animal consumption, as well as the milking of dairy cows.

In 2003, the town sent letters to property owners in the area, including the defendants, advising them of the town's interest in expanding the industrial park and the need to evaluate the area to determine the feasibility of constructing roads and utilities.[4] Thereafter, town officials met with these property owners, including the defendants, and explained the study further. The defen-

---

[4] It is undisputed that the project presently is a feasibility study only. No further financial appropriations have been made, no relevant permits or approvals have issued from the appropriate boards, and no land has yet been acquired by purchase or eminent domain.

dants nevertheless refused to consent to the town's surveyors entering upon their land, and have ordered them off on at least two occasions.[5] Thompson testified, however, that the feasibility assessment cannot be completed with an acceptable level of accuracy without surveying the defendants' properties. Thompson testified that the surveyors need access to a 300 foot corridor on the defendants' property to plan the centerline of a proposed roadway and to outline the location of wetlands.

Subsequently, the town, via an order to show cause, applied to the trial court for temporary and permanent injunctions requiring the defendants to allow town agents access to their property for the purpose of conducting a survey pursuant to § 7-148 (c) (6) (A) (iii). The trial court held a hearing on the order, which the parties stipulated would serve as the full and final hearing on the merits of the case. The trial court granted the town's application for a permanent injunction and rejected the defendants' argument that the town's surveying activities were not "public improvement[s]," as contemplated by § 7-148 (c) (6) (A) (iii), because they were limited to feasibility studies only. The trial court, noting that the "town has the power to take this land by eminent domain, [but] prefers to determine the physical and financial feasibility of the project before investing town funds in a taking that could prove to be detrimental to all concerned," concluded that the defendants' construction of the statute would preclude the town

[5] Walter Werbiski testified that the surveyors' work already had and would continue to interfere with his farming because: (1) the surveying stakes placed and holes augured into the ground would damage his crops; (2) his animals might eat the plastic surveying flags; and (3) the stakes in the ground, as well as any rocks dug up by the process, might cause expensive damage to his farm machinery. He also testified, however, that the surveying could be done without harm to his property if it were commenced in late fall after the final harvest, and the surveying flags and stakes were removed completely thereafter.

from engaging in "careful and informed planning . . . ." The trial court did state, however, that it was "disturbed by the manner in which an earlier entry onto the subject property by town agents was conducted," and ordered that the surveying work be completed after the defendants' growing season had concluded, with other accommodations to be negotiated by the parties. The trial court retained jurisdiction over the matter for further review if necessary, and rendered judgment in accordance with its order. This appeal followed.[6]

## I

We begin with the defendants' first claim, which is that the trial court improperly concluded that the town was authorized to enter the defendants' land pursuant to § 7-148 (c) (6) (A) (iii), because the statutory term "public improvement" contemplates only projects that are either: (1) already in existence; or (2) less speculative than a feasibility study, with the municipality's willingness to proceed having been demonstrated through either the appropriation of funds or the acquisition of land by market purchase or eminent domain. The defendants also contend that the trial court's decision renders superfluous General Statutes § 48-13,[7] which permits

---

[6] The defendants subsequently moved, pursuant to Practice Book § 66-5, for an articulation as to the extent of the pleading and proof of the irreparable harm that would be suffered by the town if the injunction did not issue. The trial court granted this motion and issued an articulation explaining that: (1) the town need not plead " 'irreparable harm' " because it was enforcing a statutory right to enter onto the defendants' land; and (2) denial of the application would constitute irreparable harm because the town would lose the opportunity to assess land before expending public funds to acquire it, and thus would be required to undertake a costly gamble that might preclude development altogether.

[7] General Statutes § 48-13 provides: "Upon filing a notice of condemnation of a condemning authority, either before or after the institution of a condemnation proceeding and after reasonable notice to the property owner or owners affected, the Superior Court or any judge thereof may authorize such condemning authority to enter upon and into land and buildings sought or proposed for public uses for the purpose of inspection, survey, borings and other tests. Such condemning authority shall be responsible to the

condemning authorities, after filing a notice of condemnation and obtaining judicial approval, "to enter upon and into" the subject property "for the purpose of inspection, survey, borings and other tests." The town asserts in response that the trial court properly construed § 7-148 (c) (6) (A) (iii), because, notwithstanding the statute's failure to include the word "contemplated," the defendants' construction of the statute frustrates the responsible planning of public improvements, which is a matter distinct from the condemnation process. We agree with the town.

The defendants' claim raises an issue of statutory construction over which our review is plenary. *Manifold* v. *Ragaglia*, 272 Conn. 410, 419, 862 A.2d 292 (2004). "It is well settled that in construing statutes, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature"; (internal quotation marks omitted) id.; and that "[t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." General Statutes § 1-2z.

We begin with the text of the statute. Section 7-148 (c) sets forth the scope of the powers granted to municipalities,[8] which include, inter alia, the power to "[e]*nter into or upon any land for the purpose of making neces-*

owner or owners of such property for any damage or injury caused by such entrance and use, and such court or judge may require the filing of a bond or deposit of surety to indemnify the owner or owners of property for such damage. This section shall not limit or modify rights of entry upon private property otherwise provided for by law."

[8] A " 'municipality' " is defined as "any town, city or borough, consolidated town and city or consolidated town and borough." General Statutes § 7-148 (a).

*sary surveys or mapping in connection with any pub-lic improvement,* and take by eminent domain any lands, rights, easements, privileges, franchises or struc-tures which are necessary for the purpose of establish-ing, constructing or maintaining any public work, or for any municipal purpose, in the manner prescribed by the general statutes . . . ." (Emphasis added.) General Statutes § 7-148 (c) (6) (A) (iii).

We conclude that the phrase "public improvement," as used in § 7-148 (c) (6) (A) (iii), is not limited to projects that either already exist or have been approved and funded by the municipality. Accordingly, § 7-148 (c) (6) (A) (iii) includes within its ambit studies such as that undertaken in the present case, which are intended to determine the feasibility of a particular project. This conclusion is dictated by the broad lan-guage of § 7-148 (c) (6) (A) (iii), read both by itself, and in conjunction with the rest of the statutory scheme.

We first note that town officials are authorized to "[e]nter into or upon *any* land" to perform surveys "in connection with *any* public improvement . . . ." (Emphasis added.) General Statutes § 7-148 (c) (6) (A) (iii). This repeated use of the word "any" indicates the legislature's intention to give municipal officials a broad power of entry. See *Commission on Human Rights & Opportunities* v. *Board of Education*, 270 Conn. 665, 707, 855 A.2d 212 (2004) ("[t]he repeated use in [General Statutes] § 46a-58 [a] of the word 'any'—'any person,' 'any other person,' and 'any rights, privileges or immuni-ties, secured or protected by the Constitution or laws of this state or of the United States'—indicates an inten-tion to protect a broad and inclusive range of persons from broadly specified forms of discrimination by a broad and inclusive range of actors").

This conclusion is reinforced when § 7-148 (c) (6) (A) (iii) is viewed in the context of related subparagraphs of

that statute that empower the municipality, inter alia, to: (1) "[c]reate, provide for, construct, regulate and maintain all things in the nature of public works and improvements"; General Statutes § 7-148 (c) (6) (A) (ii); (2) "[l]ay out, construct, reconstruct, repair, maintain, operate, alter, extend and discontinue sewer and drainage systems and sewage disposal plants"; General Statutes § 7-148 (c) (6) (B) (i); and (3) "[l]ay out, construct, reconstruct, alter, maintain, repair, control, operate, and assign numbers to streets, alleys, highways, boulevards, bridges, underpasses, sidewalks, curbs, gutters, public walks and parkways . . . ." General Statutes § 7-148 (c) (6) (C) (i). A construction of § 7-148 (c) (6) (A) (iii) permitting feasibility studies aids, rather than hinders, municipalities in their exercise of these powers, especially those regarding the creation and laying out of public works and improvements.

Moreover, "this [court] presum[es] that the legislature intends to create statutes with reasonable and rational results . . . [and] will not interpret statutes in such a way that would lead to a 'bizarre or absurd result.' " (Citation omitted.) *First Union National Bank* v. *Hi Ho Mall Shopping Ventures, Inc.*, 273 Conn. 287, 294, 869 A.2d 1193 (2005). The construction of § 7-148 (c) (6) (A) (iii) proffered by the defendants would hamstring municipalities considering whether to undertake public works projects by forcing the towns to undertake costly, and frequently adversary, proceedings to condemn a property that the study ultimately might show is unnecessary or unsuitable for the project at issue. Under the defendants' construction of the statute, a municipality unwilling to condemn properties merely for the purpose of undertaking feasibility studies would be left in the position of having to gamble on the feasibility of the proposed project.[9] We presume that the legisla-

---

[9] The defendants also contend that this construction of § 7-148 (c) (6) (A) (iii) would have the unacceptable result of permitting municipal officials to "abuse their power" and let "surveyors enter onto private land, only on [a]

ture did not intend such an irrational result. See id., 294 (rejecting construction of General Statutes § 49-31 that would "permit foreclosure of liens against state owned properties" because that construction would result in "the state's loss of title and possession of state owned properties that are critical to the administration of state government, such as, for example, correctional facilities, courthouses and state owned hospitals"). Accordingly, inasmuch as our reading of the plain language of § 7-148 (c) (6) (A) (iii), both by itself and with respect to "its relationship to other statutes"; General Statutes § 1-2z; leads to a result that is not irrational or absurd, we must reject the defendants' construction of that statute.

We also disagree with the defendants' contention that this construction would render superfluous § 48-13, which permits condemning authorities, with judicial authorization after the filing of a notice of condemnation, "to enter upon and into land and buildings sought or proposed for public uses for the purpose of inspection, survey, borings and other tests."[10] See footnote 7 of this opinion. Adopting this construction of § 7-148 (c) (6) (A) (iii), which would require towns to resort first to condemnation proceedings, would foster the incongruous result of encouraging municipalities to use the eminent domain power without requiring those towns to demonstrate that the takings truly are neces-

whim or with an improper motive . . . ." This contention lacks any basis in the record of the present case, which demonstrates that Thompson's feasibility study was approved and funded by the town council, and is not an abusive or capricious act by a single official.

[10] We also note that the defendants contended at oral argument before this court, for the first time in this case, that the proper method for the town to gain access to survey their property would be to take by eminent domain a "development easement" on their property. We need not address this argument because this claim was neither raised at trial nor properly briefed. See, e.g., *City Recycling, Inc.* v. *State*, 257 Conn. 429, 455, 778 A.2d 77 (2001).

sary. See *Kelo* v. *New London*, 268 Conn. 1, 87–89, 843 A.2d 500 (2004) (municipality's determination that land taken by eminent domain is "reasonably necessary" for project is subject to judicial review for bad faith or abuse of power), aff'd, 545 U.S. 469, 125 S. Ct. 2655, 162 L. Ed. 2d 439 (2005). Moreover, § 48-13 provides explicitly that the power of entry under that section "shall not limit or modify rights of entry upon private property otherwise provided for by law." Accordingly, we conclude that the trial court properly construed § 7-148 (c) (6) (A) (iii) as authorizing the town's entry upon the defendants' land for purposes of the feasibility study.

## II

We next turn to the defendants' claim that the town failed to plead and to prove sufficiently irreparable harm. Specifically, the defendants contend that the trial court's conclusion that the town proved the requisite irreparable harm was based on assumptions and speculation about the impact of their refusal to permit entry on the ultimate success of the industrial park expansion, and that the town did not prove that their actions had deprived it of any future financial benefit. In response, the town, citing Thompson's testimony, argues that the trial court did not abuse its discretion by ordering the injunction because the defendants' actions have prevented the town from accurately completing the feasibility study and exercising its statutory right pursuant to § 7-148 (c) (6) (A) (iii). We agree with the town.[11]

"We begin with the governing principles for our standard of review as it pertains to a trial court's discretion

---

[11] The defendants also contend that the trial court improperly concluded that, under *Conservation Commission* v. *Price*, 193 Conn. 414, 421, 479 A.2d 187 (1984), the town was not required to plead or to prove irreparable harm because the injunction enforced its statutory right of entry under § 7-148 (c) (6) (A) (iii). We need not address this contention because we conclude that the complaint and the evidence adduced at trial otherwise satisfied the pleading and proof requirements with respect to irreparable harm.

to grant or deny a request for an injunction: A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law. . . . A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion. . . . Therefore, unless the trial court has abused its discretion, or failed to exercise its discretion . . . the trial court's decision must stand. . . . The extraordinary nature of injunctive relief requires that the harm complained of is occurring or will occur if the injunction is not granted. Although an absolute certainty is not required, it must appear that there is a substantial probability that but for the issuance of the injunction, the party seeking it will suffer irreparable harm. . . . We note also that, [i]n exercising its discretion, the court, in a proper case, may consider and balance the injury complained of with that which will result from interference by injunction." (Citations omitted; internal quotation marks omitted.) *Tighe* v. *Berlin*, 259 Conn. 83, 87–88, 788 A.2d 40 (2002).

We conclude that the trial court did not abuse its discretion by issuing an injunction requiring the defendants to allow town agents access to their property. It was not improper for the trial court to credit Thompson's testimony that the feasibility project could not be completed with an acceptable level of accuracy without an assessment of the defendants' properties, and therefore, that the town would spend public moneys based on an incomplete assessment at its own peril. The trial court also properly considered the defendants' interference with the town's exercise of its statutory right of entry, which is a harm that could be remedied only by a grant of access to the subject properties. Moreover, the conditions attached to the injunction, and specifi-

cally, the requirement that the survey be performed after the growing season so as not to interfere with the defendants' farming activities, indicate that the trial court considered the equities involved. Accordingly, the trial court did not abuse its discretion by granting the town's application for an injunction.

The judgment is affirmed.

In this opinion KATZ and VERTEFEUILLE, Js., concurred.

BORDEN, J., with whom PALMER, J., joins, concurring. I agree with and join the majority opinion. I write separately only to emphasize that, in my view, the issue of statutory interpretation in the present case cannot properly be resolved by looking only at the text of the statutory scheme. I disagree with the conclusion of the majority that General Statutes § 7-148 (c) (6) (A) (iii) is plain and unambiguous and that, therefore, our interpretive task is constrained by General Statutes § 1-2z. I therefore add these brief comments.

In my view, the question of whether § 7-148 (c) (6) (A) (iii) requires a town to vote first, at least preliminarily, to adopt a public improvement before entering onto a citizen's property is not answered by the plain and unambiguous meaning of the statute, whether taken alone or in conjunction with other statutes. Put simply, the proffered interpretation of the defendant property owners, Walter Werbiski and Joyce Werbiski, namely, that no such entry is authorized unless and until the plaintiff, the town of Wallingford (town), votes in some fashion to adopt such an improvement, is reasonable; therefore, the statute cannot be considered plain and unambiguous in its meaning.[1]

---

[1] "The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *Tarnowsky* v. *Socci*, 271 Conn. 284, 287 n.3, 856 A.2d 408 (2004).

First, I note that it was the defendants, not the town, that argued that the plain meaning of the statute favored their interpretation. They plausibly argued that the language of the statute does not include the planning process for potential public improvements. Similarly, the town conceded at oral argument before this court that its interpretation requires this court to read in the word "potential" before "public improvement." Thus, in effect, the town conceded that the meaning of the statute was not plainly in its favor.

Second, the defendants' interpretation of the statute is certainly reasonable. That interpretation is that, in order for the town to be able to exercise the drastic remedy of entering a citizen's land without the owner's permission—in effect, to engage in conduct that would be a trespass but for the court's permission—the statute should be read to require the town at least to take a preliminary vote to undertake a "public improvement," and not merely to contemplate or envision such a public improvement. Of course, the town's vote could be conditioned upon a subsequent feasibility determination, which would be determined by the engineer's study.

Therefore, in order to resolve this case we have to go beyond the text of the statute to an appropriate extratextual source of its meaning, namely, its purpose. I would infer a broad public purpose of the statute, as the town argues, namely, to permit a rational planning process by the town, under appropriate supervision of the court, in imposing stringent limitations on the town's entry onto the land, without the town having to go through a formal vote to undertake a public improvement that might ultimately prove not to be feasible. Interpreted in light of this purpose, and for the other reasons stated by the majority, I would affirm the judgment of the trial court.