# NEMS, PLLC *v.* HARVARD PILGRIM HEALTH CARE OF CONNECTICUT, INC.
## (SC 20914)

McDonald, D'Auria, Mullins, Ecker, Alexander,
Dannehy and Bright, Js.*

*Syllabus*

The United States District Court for the District of Connecticut certified to this court, pursuant to statute (§ 51-199b (d)), three questions of law in connection with the efforts of the plaintiff, a group of emergency medicine physicians, to recover damages from the defendant health insurance company for its alleged violations of the Connecticut Unfair Trade Practices

---

witnesses. Connecticut Criminal Jury Instructions 2.1-2, available at https://www.jud.ct.gov/ji/criminal/Criminal.pdf (last visited August 19, 2024). Connecticut case law has recognized such a cautionary instruction for at least as long. See, e.g., *State* v. *Rosario*, 209 Conn. App. 550, 565–66, 267 A.3d 946, cert. denied, 342 Conn. 901, 270 A.3d 98 (2022); *State* v. *Swilling*, 180 Conn. App. 624, 644–45, 184 A.3d 773, cert. denied, 328 Conn. 937, 184 A.3d 268 (2018); *State* v. *Fernandez*, 169 Conn. App. 855, 874–75, 153 A.3d 53 (2016). For reasons not apparent from the record, however, the trial court's cautionary instruction did not contain a specific warning about the court's own questions, instead instructing only that its "actions during the trial in ruling on motions or objections by counsel, or in comments to counsel or in setting forth the law in these instructions are not to be taken by you as any indication of [its] opinion as to how you should determine or resolve questions of fact." Although a cautionary instruction can sometimes prevent harm or prejudice from a party's or a trial court's actions, neither the majority nor the state can rely on such an instruction in the present case to counteract what, in my view, was the almost certain impact of the court's questions on the jurors. See, e.g., *Filakosky* v. *Valente*, 175 Conn. 192, 196, 397 A.2d 95 (1978) (cautionary instructions "tend to remove any doubts that the court properly discharged its duty of leaving the jury free to determine the facts and draw [its] own conclusions therefrom" (internal quotation marks omitted)).

* This case originally was argued before a panel of this court consisting of Chief Justice Robinson and Justices McDonald, D'Auria, Mullins, Ecker, Alexander and Dannehy. Thereafter, Chief Judge Bright was substituted for Chief Justice Robinson. Chief Judge Bright has read the briefs and appendices and listened to a recording of the oral argument prior to participating in this opinion.

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

Act (CUTPA) (§ 42-110a et seq.) and Connecticut's surprise billing law (§ 38a-477aa). *Held*:

Connecticut law does not recognize a cause of action under CUTPA for conduct that violates Connecticut's surprise billing law but that is not identified as an unfair insurance practice under the Connecticut Unfair Insurance Practices Act (§ 38a-815 et seq.).

The surprise billing law does not require a health insurance carrier, pursuant to § 38a-477aa (b) (3) (A), to reimburse a health-care provider for the share of the insured's cost of out-of-network emergency services rendered to the insured (such as a deductible or a copayment) and then to later recover such amount from the insured; rather, the surprise billing law allows the insurer to deduct the insured's cost of the out-of-network services from the amount that it pays to the health-care provider and contemplates that the health-care provider will collect the insured's share of the cost of the services directly from the insured.

The defendant's practice of paying the plaintiff only the amount that exceeds the insured's in-network deductible, copayment, or coinsurance, and leaving the plaintiff to recover the remaining amount directly from the insured, regardless of whether such remaining amount is greater than the amount that the insured would have been personally responsible to pay if he or she had obtained services from an in-network provider, was not a violation of the surprise billing law.

Argued February 6—officially released August 21, 2024**

*Procedural History*

Action seeking damages for, inter alia, the defendant's alleged violation of the Connecticut Unfair Trade Practices Act, and for other relief, removed to the United States District Court for the District of Connecticut, which certified certain questions of law to this court concerning the interpretation of Connecticut's surprise billing law and whether an action can be maintained under the Connecticut Unfair Trade Practices Act for conduct that does not violate the Connecticut Unfair Insurance Practices Act but that purportedly violates the surprise billing law.

*Kristen L. Zaehringer*, with whom were *Simon I. Allentuch* and *Timothy C. Cowan*, for the appellant (plaintiff).

** August 21, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

350 Conn. 525    NOVEMBER, 2024    527

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

*John W. Cerreta*, with whom were *Elizabeth P. Reters-dorf, Matthew J. Letten*, and, on the brief, *Jeffrey P. Mueller*, for the appellee (defendant).

*Scott T. Garosshen, Patrick W. Begos* and *Milanna Dat-low* filed a brief for the Connecticut Association of Health Plans as amicus curiae.

*Opinion*

DANNEHY, J. The present case, which reaches us in the form of three certified questions from the United States District Court for the District of Connecticut, arises from an ongoing billing dispute between a group of emergency room physicians and an insurance company (insurer or carrier). The dispute revolves around the requirements imposed by the so-called "surprise billing law," General Statutes § 38a-477aa. The surprise billing law affords various protections to insured individuals (insureds) who have no realistic choice but to obtain medical care outside of their insurance carrier's network of health-care providers, such as when they are taken to the nearest emergency room during a medical emergency, as well as to the medical professionals who treat them. The plaintiff physicians' group, NEMS, PLLC, contends that those protections include the following: (1) there is a private cause of action under the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., for conduct that violates the surprise billing law, even if that conduct is not identified as an unfair insurance practice under the Connecticut Unfair Insurance Practices Act (CUIPA), General Statutes § 38a-815 et seq.; (2) the surprise billing law requires that a carrier pay a provider directly for the full allowable cost of out-of-network emergency care (allowable amount) and then seek reimbursement from its insured for any applicable copayment, deductible, coinsurance, or other out-of-pocket cost sharing expenses, rather than remitting its share and then leaving the provider to collect the insured's share; and (3) an insured's

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

required cost share for out-of-network emergency care is arrived at by determining what that amount would be as applied to the average or typical cost of in-network emergency care in the area, rather than by applying the maximum allowable amount of cost sharing under the insured's policy to the cost of out-of-network care. The defendant carrier, Harvard Pilgrim Health Care of Connecticut, Inc., now known as Harvard Pilgrim Health Care, Inc., takes issue with each of those contentions. We agree with the defendant.

We begin by summarizing the legal, factual, and procedural background, as characterized by the District Court. See generally *NEMS, PLLC* v. *Harvard Pilgrim Health Care of Connecticut, Inc.*, 680 F. Supp. 3d 158 (D. Conn. 2023). "Health insurers often negotiate agreements with medical providers that set an . . . amount the provider is allowed to charge patients for a given treatment or service. . . . Providers with such negotiated agreements are called in-network providers. . . .

"When a patient receives a medical service from an in-network provider, the provider bills for the allowed amount under the provider's agreement with the insurer. The insurer typically pays a portion of the provider's fee, and the patient pays what is known as a [cost share], which is typically made up of a deductible, copayment, or coinsurance. . . .

"[When], however, a patient is treated by a provider that does not have an agreement with the patient's insurer, that provider is considered [out of network]. When a provider is [out of network], the provider can generally choose what it charges the patient for a given procedure or treatment. . . . Whether a provider is [out of network] or [in network] for a given patient can significantly increase or decrease the cost the insured is required to bear. . . . [I]n addition to out-of-network providers having no pre-negotiated maximum allowed

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

amount, in-network and out-of-network services have different benefit structures, with patients typically having to pay higher deductibles or coinsurance rates for out-of-network services. . . .

"The [s]urprise [b]illing [l]aw was enacted by the Connecticut [l]egislature in 2015. . . . [The law] was passed in an effort to shield patients from being saddled with surprisingly high medical bills when they receive emergency medical treatment. In a medical emergency, the logic goes, a patient does not have time to examine which providers or facilities may be [in network] or [out of network]; she simply goes to the place she can reach the quickest. The [s]urprise [b]illing [l]aw is intended to prevent such a patient from being punished for making the expedient choice by having to pay a higher cost for the out-of-network provider's services than she would have had to pay for similar services rendered by an in-network provider." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 161–62.

Two provisions of the surprise billing law are particularly relevant to this action. The first, § 38a-477aa (b) (3) (A), allows a provider to bill a carrier directly for emergency services provided out of network to the carrier's insured. That provision requires the carrier to reimburse the provider the greatest of three amounts: the amount the insured's health-care plan would pay for such services if they had been rendered by an in-network provider; the usual, customary and reasonable rate for such services in the area; or the amount Medicare would reimburse for such services. The second provision at issue, § 38a-477aa (b) (2), prohibits a carrier from imposing out-of-pocket cost sharing expenses for out-of-network emergency care that are greater than would be imposed if the insured had seen an in-network provider.[1]

---

[1] The full text of the relevant provisions is set forth in either part II or part III of this opinion. This action encompasses services that were provided and bills that were submitted for different insureds over a period of time.

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

During the relevant time frame, the plaintiff "employed emergency medicine physicians and supplied them to hospital emergency departments," and the defendant "provided health insurance policies to Connecticut residents." *NEMS, PLLC* v. *Harvard Pilgrim Health Care of Connecticut, Inc.*, supra, 680 F. Supp. 3d 163. Because the parties had not entered into a provider agreement, the plaintiff's physicians were out of network vis-à-vis the defendant's insureds. Id. When one of those insureds received treatment from the plaintiff's physician members, the defendant would determine the allowable amount for the procedure according to its understanding of the surprise billing law, calculate the insured's in-network cost sharing obligations, again, according to its understanding of the law, and remit to the plaintiff the difference between those two figures, leaving the plaintiff to collect the balance—the cost share—directly from the insured. See id.

In 2018, when the plaintiff began using a new revenue management company, it disputed the defendant's interpretation of the surprise billing law and the formula by which the defendant was calculating its share and its insureds' shares of the allowable amount. Id. As we explain further in part III of this opinion, the defendant reads § 38a-477aa (b) (2) to mean only that a carrier may not impose copayments, deductibles, and other cost sharing expenses for emergency care at an out-of-network rate; that is to say, all emergency care must be treated as in-network care for cost sharing purposes. The plaintiff, by contrast, began, in 2018, to construe the law to mean that an insured's cost sharing amount should be calculated based on what the insured would pay for a lower, in-network *cost of services*, as opposed to the amount

Although § 38a-477aa has been amended since the federal action was filed on September 1, 2021, those amendments are not relevant to this appeal. For purposes of convenience and clarity, we refer to the current revision of the statute.

350 Conn. 525 NOVEMBER, 2024 531

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

allowed under § 38a-477aa (b) (3), and the cost sharing amount permitted under the insured's policy. Moreover, relying on General Statutes § 20-7f; see part III of this opinion; the plaintiff also took the position that, if the sum of the insured's cost sharing contribution, as understood by the plaintiff, and the amount the carrier pays, does not cover the total allowable amount, the provider would not be permitted to "balance bill" the insured for the unpaid balance.[2]

The parties' divergent understandings of how much an insured is required to contribute to the costs of out-of-network emergency care resulted in a gap between the amount the plaintiff believed it was entitled to be paid under the surprise billing law and the amount that it believed it was actually able to recover. Specifically, the plaintiff only collected from the insured what it took to be the insured's lower required contribution under the surprise billing law, and then tried to collect the remaining balance from the defendant. The defendant refused to pay those balances, leading the plaintiff to file the present action in state court, which subsequently was removed to federal court.

The operative second amended complaint alleges violations of CUTPA and standalone violations of the surprise billing law, and seeks compensatory damages, punitive damages, and a declaratory judgment interpreting the surprise billing law. Among other things, the plaintiff seeks payments that it claims the defendant owes for the treatment of nearly 300 of the defendant's insureds, who obtained emergency services from the plaintiff's physician members between 2018 and 2021.

---

[2] Balance billing occurs when the total bill for a medical treatment exceeds the sum of the insured's cost sharing contributions and the amount paid by the carrier, and the provider attempts to bill the insured for the outstanding balance. See, e.g., *Gianetti* v. *Rutkin*, 142 Conn. App. 641, 650–51, 70 A.3d 104 (2013). Statutory restrictions on cost sharing would count for little if a provider could simply bill the insured for any remaining balance that the carrier was unwilling to cover.

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

The District Court granted the defendant's motion to dismiss the plaintiff's stand-alone claims under the surprise billing law, concluding that the law does not create a private right of action. See *NEMS PLLC* v. *Harvard Pilgrim Health Care of Connecticut Inc.*, 615 F. Supp. 3d 125, 135–36 (D. Conn. 2022). The parties then filed competing motions for summary judgment as to the plaintiff's remaining claims. The primary issues raised were, first, whether the plaintiff had stated a cognizable CUTPA claim and, second, which party's interpretation of § 38a-477aa (b) (2) was correct. The District Court held a hearing on these issues, during which the court, sua sponte, raised a third question, namely, whether § 38a-477aa (b) (3) should be construed to mean that a carrier must directly pay the provider the entire allowable amount under the greatest of three and then collect the deductible or other cost share from its insured. Both parties initially eschewed this reading of the statute, observing that it would effect a dramatic change in the way medical bills are paid, although the plaintiff later embraced it. See *NEMS, PLLC* v. *Harvard Pilgrim Health Care of Connecticut, Inc.*, supra, 680 F. Supp. 3d 165.

The District Court, concluding that the matters in dispute at the summary judgment stage presented issues of first impression under Connecticut law, certified the following three questions[3] to this court pursuant to General Statutes § 51-199b (d):

(1) Under any interpretation of the surprise billing law, can a plaintiff successfully maintain an action under CUTPA for actions that do not violate CUIPA but purport to violate the surprise billing law, because the surprise billing law regulates a specific type of insurance related conduct, under *State* v. *Acordia, Inc.*, 310 Conn. 1, 73 A.3d 711 (2013) (*Acordia*)?

---

[3] We have reordered the certified questions to facilitate our analysis.

350 Conn. 525 NOVEMBER, 2024 533

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

(2) Does Connecticut's surprise billing law, which provides in relevant part that, "[i]f emergency services were rendered to an insured by an out-of-network health care provider, such health care provider may bill the health carrier directly and the health carrier shall reimburse such health care provider the greatest" of three amounts; General Statutes § 38a-477aa (b) (3) (A); require a health insurance carrier to fully reimburse an out-of-network health-care provider at the greatest of the three amounts for emergency services rendered to its insureds, and then later recover any applicable deductible, copayment, or coinsurance directly from the insured?

(3) If the answer to the second question is "no," is the defendant's practice of paying the plaintiff only that amount that exceeds the insured's in-network deductible, copayment, or coinsurance, and leaving the plaintiff to recover the remaining amount directly from the insured, regardless of whether such remaining amount is greater than the amount that the insured would have been personally responsible to pay had they visited an in-network provider, a violation of the surprise billing law?

*NEMS, PLLC* v. *Harvard Pilgrim Health Care of Connecticut, Inc.*, supra, 680 F. Supp. 3d 169–70.

Because the certified questions raise issues of statutory construction, our review is guided by General Statutes § 1-2z, the plain meaning rule.

I

A

The first certified question invites us to clarify our decision in *Acordia* and, specifically, to determine whether Connecticut law recognizes a cause of action under CUTPA for conduct that violates the surprise billing law but is not identified as an unfair insurance

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

practice under CUIPA. We answer that question in the negative.

The following principles frame our analysis. In determining whether a practice violates CUTPA, we have adopted the so-called "cigarette rule": "(1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some [common-law], statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [or] (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]." (Internal quotation marks omitted.) *Kent Literary Club of Wesleyan University* v. *Wesleyan University*, 338 Conn. 189, 232, 257 A.3d 874 (2021).

In *Mead* v. *Burns*, 199 Conn. 651, 661, 509 A.2d 11 (1986), this court considered the scope of liability that CUTPA imposes on the insurance industry. This court concluded that CUIPA, which regulates the insurance industry but affords no private right of action; *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, 317 Conn. 602, 623, 119 A.3d 1139 (2015); and CUTPA have overlapping jurisdiction, such that any conduct that the legislature has expressly identified as an unfair insurance practice under CUIPA may form the basis of a CUTPA claim. See *Mead* v. *Burns*, supra, 661–63. This court also strongly suggested in *Mead* that the inverse is true as well, that conduct that is not prohibited by CUIPA is not actionable under CUTPA. See id., 663–66.

We revisited the issue in *Acordia*, considering "whether the legislature intended CUIPA to serve as the comprehensive and exclusive means of identifying unfair insurance practices," or whether other insurance practices could independently qualify as unfair under the ciga-

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

rette rule and, therefore, violate CUTPA. *State* v. *Acordia, Inc.*, supra, 310 Conn. 18. We recognized that § 38a-815 "identifies two different ways in which a practice may be determined to be an unfair insurance practice in violation of CUIPA: the practice may fall under one of the defined unfair insurance practices in [General Statutes] § 38a-816, or the Insurance Commissioner (commissioner) may determine, pursuant to General Statutes §§ 38a-817 and 38a-818, that the practice constitutes an unfair method of competition or an unfair or deceptive act or practice in the business of insurance . . . ." (Internal quotation marks omitted.) Id., 19.

Reviewing the statutory scheme and its legislative history, we found several reasons to conclude in *Acordia* that the legislature intended those two paths to be the exclusive means of identifying unfair insurance practices for purposes of CUTPA. First, with respect to § 38a-816, we relied on the canon of construction that, "[u]nless there is evidence to the contrary, statutory itemization indicates that the legislature intended the list to be exclusive." (Internal quotation marks omitted.) Id., 21. Second, we noted that the legislature identified the list of unfair insurance practices contained in § 38a-816 as definitional, not merely as examples of unfair insurance practices, which further "constrain[s] the discretion of courts to look to other sources in finding a particular insurance practice to be unfair . . . ." (Internal quotation marks omitted.) Id. Third, assuming that this statutory analysis did not unambiguously resolve the matter, we looked to the origin and history of the statutory scheme for further guidance. See id., 24. There, we found persuasive evidence "not only that the legislature intended to set out specifically the types of actions that constitute unfair insurance practices in a highly detailed manner, but also that the legislature viewed accomplishing that task as essential to the underlying purpose of CUIPA . . . ." Id., 25–26.

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

We concluded that "[t]he many subsequent amend-
ments incorporating additional practices as violative of
CUIPA demonstrate an ongoing legislative effort to
keep the list of prohibited practices as current as possi-
ble and provide further evidence of the legislature's
intent to provide in CUIPA a comprehensive list of
unfair insurance practices." Id., 26.

At various points throughout our decision in *Acordia*,
we drew conclusions from this analysis that appeared
to rule out the possibility that there could be unfair
insurance practices other than those expressly enumer-
ated in § 38a-816 or otherwise defined by the commis-
sioner pursuant to §§ 38a-817 and 38a-818. See, e.g., id.
("the legislature intended to occupy the field of defining
unfair insurance practices"); id., 27 ("conduct by an
insurance broker or insurance company that is related
to the business of providing insurance can violate
CUTPA only if it violates CUIPA"); id., 35 ("a plaintiff
must establish a CUIPA claim in order to establish a
CUTPA claim for insurance related business prac-
tices"); id. ("this court strongly suggested [in *Mead*]
that the legislative determinations as to unfair insurance
practices embodied in CUIPA are the exclusive and
comprehensive source of public policy in this area");
id., 36 ("we see no reason why an allegation of a specific
type of insurance related conduct that the legislature
has expressed no opinion about should be found to
support a CUTPA claim"). We reiterated these conclu-
sions in *Artie's Auto Body, Inc.* See *Artie's Auto Body,
Inc.* v. *Hartford Fire Ins. Co.*, supra, 317 Conn. 624
n.14; see also id., 624 ("as a general rule, a plaintiff
cannot bring a CUTPA claim alleging an unfair insur-
ance practice unless the practice violates CUIPA").

Still, in summarizing our holding in *Acordia*, we left
open the possibility—seemingly in tension with those
conclusions—that a CUTPA claim might lie for insur-
ance practices that, although not prohibited under

350 Conn. 525 NOVEMBER, 2024 537

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

CUIPA, violate some other statute. We stated: "Because CUIPA provides the exclusive and comprehensive source of public policy with respect to general insurance practices, we conclude that, unless an insurance related practice violates CUIPA *or, arguably, some other statute regulating a specific type of insurance related conduct*, it cannot be found to violate any public policy and, therefore, it cannot be found to violate CUTPA." (Emphasis added.) *State* v. *Acordia, Inc.*, supra, 310 Conn. 37; see also id., 37–38 ("we conclude that a common-law breach of fiduciary duty arising in the insurance context that does not violate CUIPA *or some other statute regulating the insurance industry* cannot provide the basis for a valid CUTPA claim" (emphasis added)).

This highlighted, qualifying language was dictum in *Acordia*, as no other statute was at issue. The rationale offered in that decision for inserting this qualifying language is a footnote that cited the treatise of the Connecticut Practice Series on unfair trade practices for the proposition that, "if insurance related conduct violates a statute other than CUIPA, the conduct can be the subject of a CUTPA claim." (Emphasis omitted.) Id., 34 n.9, citing R. Langer et al., 12 Connecticut Practice Series: Unfair Trade Practices (2003) § 3.15, p. 133. The authors of that treatise, in turn, had relied on a 1992 Superior Court decision, a case that we suggested in *Acordia* might have been incorrectly decided. See *State* v. *Acordia, Inc.*, supra, 310 Conn. 34 n.9. Ultimately, we left the issue unresolved because it was unpreserved. Id., 34–35 n.9.

In the present case, the plaintiff relies on the qualifying language in *Acordia*, construing it broadly to mean that, although CUIPA occupies the field as to general insurance practices, other statutes that prohibit specific types of unfair insurance related conduct can provide the basis of a CUTPA claim. The plaintiff contends that

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

the surprise billing law is just such a statute. We are not persuaded.

Even if we assume for the sake of argument that violations of insurance related statutes other than CUIPA can give rise to a CUTPA claim, the meaning of the highlighted language in *Acordia* cannot be as broad as the plaintiff suggests. Chapter 38a of the General Statutes, which encompasses more than one thousand individual statutes, prohibits numerous, *specific* insurance practices. One dozen or so of those prohibited practices are identified as unfair methods of competition or unfair or deceptive acts or practices in the business of insurance for purposes of CUIPA; see General Statutes § 38a-816;[4] but many others are not. Likewise, there are certain general practices—misrepresentation, false advertising, defamation, and unfair claim settlement practices, to name a few—that are defined as "unfair" under § 38a-816, and many others of critical importance to consumers that are prohibited in chapter 38a but are not included in that list. See, e.g., General Statutes § 38a-472f (rules regarding adequacy of provider networks and prohibiting incentives to provide less than medically necessary services); General Statutes § 38a-476 (rules regarding coverage of preexisting conditions); General Statutes § 38a-476a (rules regarding compliance with Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d et seq.); General Statutes § 38a-477jj (rules regarding prescription drug coverage). If any practice prohibited in chapter 38a could qualify as an unfair insurance practice,

---

[4] The plaintiff's contention that § 38a-816 identifies only *general* unfair insurance practices is perhaps best rebutted by subdivision (14) of § 38a-816, which defines, as an unfair method of competition or unfair or deceptive act or practice, discrimination in insurance "because of exposure to diethylstilbestrol through the female parent." Diethylstilbestrol is a particular form of synthetic estrogen that has not been prescribed in the United States since 1971. See *Kurczi* v. *Eli Lilly & Co.*, 113 F.3d 1426, 1427 n.2, 1431 n.10 (6th Cir. 1997).

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

as we explained in *Acordia*, there would be no reason for the legislature to have singled out a small subset of those prohibited practices to receive that designation. Nor has the plaintiff pointed to any specific provision of the surprise billing law that sets surprise billing apart from all of the other prohibited practices that the legislature chose not to include in § 38a-816.

Rather, we understand the highlighted language in *Acordia* to mean one of two things. First, the legislature is always free to specify that practices other than those listed in § 38a-816, or otherwise identified as unfair insurance practices by the commissioner, constitute CUTPA violations. For the reasons discussed in *Acordia*, however, we would expect a clear statement of legislative intent before concluding that the violation of a different insurance related statute is actionable under CUTPA. And, in fact, subsequent to our decision in *Acordia*, the legislature has done just that.

In 2017, the legislature enacted No. 17-241 of the 2017 Public Acts, which prohibits certain practices related to the provision of pharmacy services and benefits in insurance contracts. As codified, that statute provides in relevant part: "Any general business practice that violates the provisions of this section shall constitute an unfair trade practice pursuant to chapter 735a. . . ." General Statutes § 38a-477cc (c). Notably, the legislature made clear in § 38a-477cc itself that its violation also violates CUTPA but did not add § 38a-477cc, or the practices barred therein, to the list of unfair insurance practices defined in § 38a-816. The fact that the surprise billing law, which also was enacted after *Acordia* was decided, contains no reference to CUTPA or unfair trade practices, but is, instead, a separate statute that covers other insurance practices by its express terms, is a powerful indicator that the legislature intended to treat the two statutes differently in this respect. See,

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

e.g., *Dias* v. *Grady*, 292 Conn. 350, 360, 972 A.2d 715 (2009).[5]

A second possible meaning of *Acordia* is that we did not foreclose the possibility that violations of certain statutes, such as criminal statutes prohibiting the aiding and abetting of insurance fraud; see, e.g., General Statutes § 53a-215 (a) (2); might, under certain circumstances, constitute unfair trade practices in violation of CUTPA. There is reason to think that, although the legislature might deem such violations of the criminal law to be sufficiently egregious as to qualify as unfair trade practices, they are so fundamentally distinct from the types of practices prohibited throughout chapter 38a that the legislature could not reasonably be expected to have included them in § 38a-816. We need not resolve that question for present purposes, however, because the surprise billing law undoubtedly is not that sort of statute. The first certified question is answered in the negative.

B

The defendant contends that our conclusion that a CUTPA claim will not lie for a violation of the surprise billing law means that we need not proceed to resolve the remaining certified questions. We disagree.

In count one of its complaint, which alleges violations of CUTPA, the plaintiff contends both that the defendant's alleged violations of the surprise billing law impli-

[5] Section 20-7f (b) identifies certain instances of balance billing, in the context of health insurance, that violate CUTPA, even though they are not addressed in § 38a-816. The fact that, at the same time that the surprise billing law was enacted, the legislature amended § 20-7f (b) to specify that balance billing by a *health-care provider* in the surprise billing context constitutes a CUTPA violation but did not indicate that corresponding violations by insurers violates CUTPA, strongly supports the conclusion that the legislature intentionally decided not to include § 38a-477aa violations among those unfair insurance practices prohibited by § 38a-816. See Public Acts 2015, No. 15-146, § 11.

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

cate various of the unfair insurance practices defined in § 38a-816 and that its violation of the surprise billing law independently violates CUTPA. In part I A of this opinion, we rejected the latter contention. With respect to the former contention, the District Court concluded that many of the alleged violations of § 38a-816 were not cognizable, insofar as they lacked a required nexus between the plaintiff and the defendant, because the plaintiff had not alleged that it was injured by the defendant's refusal to abide by the terms of any insurance policies held by its insureds. See *NEMS PLLC* v. *Harvard Pilgrim Health Care of Connecticut Inc.*, supra, 615 F. Supp. 3d 140.

But the District Court also concluded that subparagraphs (D) and (F) of § 38a-816 (6), which are implicated by the defendant's alleged violations of the surprise billing law, do not require that the parties be contractually bound pursuant to an insurance policy. See id. The plaintiff alleges that the defendant violated § 38a-816 (6) (D)[6] "when it refused to pay claims without conducting a reasonable review of the claims and [the surprise billing law]." The plaintiff also claims that the defendant violated § 38a-816 (6) (F) "when it failed to settle or resolve the [disputed] claims . . . despite . . . that its legal obligations [were] clear under the surprise billing law."[7] Whether the defendant's payments to the plaintiff were fair and equitable, and whether liability was reasonably clear, depends in no small part on which party has correctly interpreted the requirements imposed by the surprise billing law.

_____

[6] General Statutes § 38a-816 (6) (D) defines as an unfair claim settlement practice "refusing to pay claims without conducting a reasonable investigation based upon all available information [with such frequency as to indicate a general business practice] . . . ."

[7] General Statutes § 38a-816 (6) (F) further defines as an unfair claim settlement practice "not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear [with such frequency as to indicate a general business practice] . . . ."

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

Because the plaintiff's allegations state a colorable CUTPA claim in at least that limited respect, we must answer the remaining certified questions.

II

The next certified question asks whether the surprise billing law requires a carrier to directly reimburse an out-of-network provider for the full allowable amount of emergency services rendered, and then recoup any applicable cost sharing directly from its insured, or whether the insurer can first deduct the insured's required contribution from the amount that it reimburses the provider. The plaintiff contends that the plain language of the statute requires full, direct reimbursement from the carrier to the provider. The defendant argues that there is "no indication the legislature intended to upend" the process by which insureds contribute their share of the cost of health-care treatment. The defendant further argues that, read in the context of the full statutory scheme, the surprise billing law does not "disregard the traditional process," pursuant to which the health-care provider, rather than the carrier, is responsible for collecting the insured's share of the cost of services. We conclude that, read as a whole, and in light of its legislative history, § 38a-477aa requires the health-care provider to collect the insured's share of the cost of services.

The statutory language at the core of the parties' dispute is contained in subparagraph (A) of § 38a-477aa (b) (3). Section 38a-477aa (b) (3) (A) provides in relevant part: "If emergency services were rendered to an insured by an out-of-network health care provider, such health care provider may bill the health carrier directly and the health carrier shall reimburse such health care provider the greatest of the following amounts: (i) The amount the insured's health care plan would pay for such services if rendered by an in-network health care

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

provider; (ii) the usual, customary and reasonable rate for such services; or (iii) the amount Medicare would reimburse for such services. As used in this subparagraph, 'usual, customary and reasonable rate' means the eightieth percentile of all charges for the particular health care service performed by a health care provider in the same or similar specialty and provided in the same geographical area, as reported in a benchmarking database maintained by a nonprofit organization specified by the Insurance Commissioner. . . .'' It is undisputed that the amount identified by § 38a-477aa (b) (3) (A) (ii), "the usual, customary and reasonable rate for such services," typically will be higher than the in-network or Medicare reimbursement rates and is the reimbursement to which the provider will be entitled in almost all cases.

The plaintiff relies on the fact that §38a-477aa permits the provider to bill the carrier "directly" and requires the carrier to reimburse the provider the usual, customary, and reasonable rate for the services provided. The plaintiff argues that nothing on the face of § 38a-477aa permits the carrier to reimburse the provider any less than that amount, such as by deducting the insured's required cost sharing contributions. As a result, the plaintiff contends, the responsibility for collecting the insured's contributions must fall to the carrier.

At first glance, the plaintiff's interpretation is one reasonable reading of § 38a-477aa (b) (3) (A) (ii). But § 1-2z instructs us also to consider, at this stage in the analysis, the relationship of clause (ii) of § 38a-477aa (b) (3) (A) to the other parts of § 38a-477aa (b) (3) (A) and to other related statutes, as well as whether this interpretation would yield absurd or unworkable results. See General Statutes § 1-2z.

It is a "basic tenet of statutory construction that the intent of the legislature is to be found not in an isolated

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

phrase or sentence but, rather, from the statutory scheme as a whole.'' (Internal quotation marks omitted.) *Wiseman* v. *Armstrong*, 269 Conn. 802, 820, 850 A.2d 114 (2004). The plaintiff's reading of the statute, however, makes sense only when reading clause (ii) of § 38a-477aa (b) (3) (A) in isolation. We must read clause (ii) together with clauses (i) and (iii). Regardless of which of the three amounts most commonly serves as the basis for calculating the provider's recovery from the carrier, by stating that the provider is entitled to the ''greatest of the following amounts''; General Statutes § 38a-477aa (b) (3) (A); which includes the options in all three clauses, the legislature contemplated that any of the three potentially could yield the greatest amount. Although clauses (i) and (iii) set forth amounts without expressly mentioning the insured's cost sharing burden, those clauses, nonetheless, clearly account for, and necessarily exclude, that burden.[8] Both amounts are limited to what the insurer or Medicare would pay for the services. See General Statutes § 38a-477aa (b) (3) (A) (i) and (iii) (''[t]he amount the insured's health care plan would pay for such services if rendered by an in-network health care provider . . . or . . . the amount Medicare would reimburse for such services''). *Those* provisions require the carrier to directly reimburse the provider for only the amount that it, or Medicare, would actually pay for an in-network visit. In practice, that amount excludes any contributions by the insured.[9]

---

[8] See General Statutes § 38a-591a (30), which provides: '' 'Participating provider' means a health care professional who, under a contract with the health carrier, its contractor or subcontractor, has agreed to provide health care services to covered persons, with an expectation of receiving payment or reimbursement directly or indirectly from the health carrier, other than coinsurance, copayments or deductibles.''

[9] Our conclusion that the legislature did not intend to completely transfer the responsibility for the collection of insureds' out-of-pocket expenses for out-of-network emergency treatment to their insurance carriers under any of the greatest of three amounts is confirmed by § 20-7f. That statute was amended at the same time the surprise billing law was enacted to provide in relevant part that it is an unfair trade practice ''for any health care provider

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

By contrast, clause (ii) of § 38a-477aa (b) (3) (A) does not, on its face, limit a provider's entitlement to reimbursement to what the insurer would otherwise pay, that is, exclusive of the insured's cost sharing burden. Instead, it identifies the amount as "the usual, customary and reasonable rate for such services . . . ." General Statutes § 38a-477aa (b) (3) (A) (ii). Interpreting § 38a-477aa (b) (3) (A) (ii) to be the sole amount among the three that includes the insured's cost sharing burden, however, would create an odd, apples to oranges payment scheme by requiring carriers to compensate providers the greatest of three amounts, when only one of those amounts includes the insured's share of the costs, and the other two include only the carrier's share.[10]

The absence of express language in clause (ii) of § 38a-477aa (b) (3) (A) specifying that copayments and other cost sharing contributions of the insured are not

to request payment from an enrollee, other than a coinsurance, copayment, deductible or other out-of-pocket expense, for . . . emergency services covered under a health care plan and rendered by an out-of-network health care provider . . . ." General Statutes § 20-7f (b), as amended by Public Acts 2015, No. 15-146 § 11. The statute does not mention anything about the carrier requesting payment from an enrollee. Accordingly, we find unpersuasive the plaintiff's reliance on the fact that § 20-7f prohibits balance billing for emergency services.

[10] We find unpersuasive the plaintiff's contention that, because other statutes, by contrast, expressly exclude that cost sharing burden, the legislature intended to include that amount in the greatest of three in § 38a-477aa (b) (3) (A). In support of this argument, the plaintiff cites to General Statutes § 38a-591a (30), which defines a "participating provider" as a "health care professional who, under a contract with the health carrier, its contractor or subcontractor, has agreed to provide health care services to covered persons, with an expectation of receiving payment or reimbursement directly or indirectly from the health carrier, *other than coinsurance, copayments or deductibles*." (Emphasis added.) The plaintiff's argument, however, does not account for the language of clauses (i) and (iii) of § 38a-477aa (b) (3) (A), which respectively limit the carrier's contribution to the amount that the carrier would pay for the services if they were provided in network, and the amount that Medicare would pay for the services. Both of those amounts exclude the amount that the insured is obligated to pay.

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

encompassed within the carrier's payment obligations is insufficient, when read in the context of the entire statute, to support the inference that the legislature intended the carrier to reimburse the provider an amount that includes the insured's share of the cost of services. Although our review of the plain language reveals that the defendant's interpretation of the statutory language is more persuasive, the plaintiff's interpretation of that language is at least plausible.

The defendant contends, however, and we agree, that the plaintiff's reading of the statute would yield absurd, unworkable, or otherwise bizarre results. We have interpreted § 1-2z to instruct Connecticut's courts, when construing statutory language, to eschew those interpretations that, although not literally impossible to effectuate, would be so bizarre, impracticable, or contrary to common sense that one cannot reasonably assume that they reflect the considered intent of the legislature. See, e.g., *Seramonte Associates, LLC* v. *Hamden,* 345 Conn. 76, 91 and nn.10–11, 282 A.3d 1253 (2022); *Casey* v. *Lamont,* 338 Conn. 479, 493, 258 A.3d 647 (2021); *Planning & Zoning Commission* v. *Freedom of Information Commission,* 316 Conn. 1, 17–18 n.13, 110 A.3d 419 (2015); *State* v. *Courchesne,* 296 Conn. 622, 710, 998 A.2d 1 (2010); *Wallingford* v. *Werbiski,* 274 Conn. 483, 491, 877 A.2d 749 (2005); see also *Cohen* v. *Rossi,* 346 Conn. 642, 700, 295 A.3d 75 (2023) (*Ecker, J.,* concurring in part and concurring in the judgment) ("[t]his court repeatedly has held that the threshold ambiguity analysis under § 1-2z should and must take into account . . . commonsense, practical considerations regarding how the statutory scheme will operate in the real world"); *State* v. *Blasko,* 202 Conn. 541, 558–59, 522 A.2d 753 (1987) (court declined to construe legislative silence to bring about "difficult and possibly bizarre result . . . sub silentio" (internal quotation marks omitted)).

350 Conn. 525 NOVEMBER, 2024 547

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

The insurance industry is—and has long been—heavily regulated. *Serrano* v. *Aetna Ins. Co.*, 233 Conn. 437, 449, 664 A.2d 279 (1995). In particular, the legislature has enacted consumer protections meant to regulate the manner by which out-of-network health-care providers collect balances due from insureds. See, e.g., General Statutes § 20-7f; General Statutes § 38a-193 (c) (3). The obligation to collect these out-of-pocket payments represents a significant burden that the current system imposes on health-care providers, and *not* having such an obligation is a corresponding benefit enjoyed by carriers. In light of this history of heavy regulation, it is unlikely that the legislature would have enacted a sea change in this system, requiring carriers to develop novel mechanisms for collecting out-of-pocket payments from their insureds, for only one small subsegment of health-care services, without acknowledging that change, let alone enacting rules to manage such a major transition and to provide insureds with protections comparable to those that they currently enjoy.

Moreover, the surprise billing law indisputably allows out-of-network providers, such as the plaintiff, to collect fees at higher than the prevailing in-network rate, and at higher even than the median usual, customary, and reasonable rate, directly from carriers. This creates a disincentive for emergency medicine physicians to join insurance networks, which would pay them at the lower, in-network rates. If the legislature had further tipped the scales in favor of providers by eliminating any costs and uncertainties associated with having to collect from insureds, emergency physicians would have little reason to join networks, which would have adverse effects on health-care cost containment efforts, contrary to the long-standing policy of this state. See, e.g., *Caraballo* v. *Electric Boat Corp.*, 315 Conn. 704, 714–20, 110 A.3d 321 (2015).

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

Because there are two plausible interpretations of the statutory language, and because adopting the plaintiff's interpretation would strain common sense, we may look to extrinsic sources of legislative intent, including the legislative history of the surprise billing law, for additional guidance. That legislative history provides further support for the defendant's position.

In the lengthy legislative history, there is no indication that the legislature intended to require that insureds contribute their share of the cost of emergency medical care directly to insurers, rather than to providers. Rather, when Representative Matthew D. Ritter introduced the surprise billing law, he twice indicated that the "greatest of three different amounts" provision was modeled on, or was intended to mirror,[11] "the Affordable Care Act," that is to say, the federal Patient Protection and Affordable Care Act of 2010 (Affordable Care Act), Pub. L. No. 111-148, 124 Stat. 763. See 58 H.R. Proc., Pt. 20, 2015 Sess., pp. 6716–17. We assume that his references were to 29 C.F.R. § 2590.715-2719A, a United States Department of Labor regulation adopted in 2010 pursuant to the Affordable Care Act, which established new protections for insureds undergoing out-of-network emergency treatment. Subparagraph (i) of 29 C.F.R. § 2590.715-2719A (b) (3), which is quite similar in structure and content to § 38a-477aa (b) (3) (A), defines each of the greatest of three amounts to exclude insured cost sharing contributions. See 29 C.F.R. § 2590.715-2719A (b) (3) (i) (2010). If the legislature had intended to depart from the federal scheme in enacting the surprise billing law, as the plaintiff advocates, it could have stated this intention in the language of the

_____

[11] Specifically, Representative Ritter stated that "there's a listing in the statute, which sort of models the Affordable Care Act, which lists different things. It would be the greatest of three different amounts . . . ." 58 H.R. Proc., supra, p. 6716. "[I]f they couldn't agree, then they'd go back to the greatest amount of the three listed, which [sort of] mirrors the Affordable Care Act . . . ." Id., p. 6717.

350 Conn. 525 NOVEMBER, 2024 549

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

statute. It did not.[12] If anything, then, the legislative history provides further support for our interpretation of the statutory text.

We thus answer the second certified question in the negative. Regardless of which of the greatest of three amounts applies, the surprise billing law does not require the carrier to reimburse the provider for the insured's out-of-pocket costs and then collect those costs from the insured. Rather, the greatest of three amounts refers only to the carrier's share of the cost of services.

## III

The third certified question addresses § 38a-477aa (b) (2) of the surprise billing law. Section 38a-477aa (b) (2) provides in relevant part that "[n]o health carrier shall impose, for emergency services rendered to an insured by an out-of-network health care provider . . . a coinsurance, copayment, deductible or other out-of-pocket expense that is greater than the coinsurance, copayment, deductible or other out-of-pocket expense that would be imposed if such emergency services were rendered by an in-network health care provider . . . ." The plaintiff interprets § 38a-477aa (b) (2) to mean that the total amount that an insured is required to pay out of pocket for emergency services provided by an out-of-network health-care provider must be calculated on the basis of the in-network cost sharing obligation of

---

[12] The different language in the federal and state statutory schemes provides an explanation for the Connecticut legislature's failure to expressly exclude cost sharing expenses from each of the greatest of three amounts. Specifically, the federal regulations refer to "[t]he amount negotiated with in-network providers for the emergency service furnished" and "[t]he amount that would be paid under Medicare"; 29 C.F.R. § 2590.715-2719A (b) (3) (i) (2010); which, standing alone, reasonably could be read to include the cost sharing component of each amount, whereas the surprise billing law, which refers to "[t]he amount the insured's health care plan would pay" and "the amount Medicare would reimburse," excludes the cost sharing component. General Statutes § 38a-477aa (b) (3) (A) (i) and (iii).

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

the insured under its policy, as applied to the in-network cost of the services. The plaintiff contends that its reading properly ensures that the total amount that an insured is required to pay for the services is the same amount that would have been required if the services had been provided by an in-network emergency department.[13]

The defendant reads the law differently. It contends that § 38a-477aa (b) (2) requires the carrier to apply in-network deductibles, copayments, and other cost sharing expenses under the insured's policy to the cost of the services, as applied to greatest of three amounts. The purpose of § 38a-477aa (b) (2), the defendant contends, is not to afford insureds the benefit of the lower rates for the cost of services that carriers negotiate with their network of providers, particularly when the carrier itself cannot receive the benefit of those negotiated rates. We agree with the defendant.

This certified question requires us to construe the meaning of the phrase "the coinsurance, copayment, deductible or other out-of-pocket expense that would be imposed if such emergency services were rendered

---

[13] The defendant construes the plaintiff's argument to rely on and center around the residual phrase "or other out-of-pocket expense" in § 38a-477aa (b) (2). We do not understand that to be the basis of the plaintiff's argument. As the District Court's hypothetical makes clear, the parties would construe the surprise billing law as they have, even if the statute applied only to deductibles and not to other out-of-pocket expenses.

Insofar as the plaintiff may rely on that residual phrase, however, that reliance would be misplaced. Specifically, the ejusdem generis canon of statutory construction suggests that this residual phrase is merely intended to encompass other types of cost sharing expenses akin to copayments and deductibles, and not qualitatively different things, such as the total amount that an insured ultimately is obligated to pay for medical treatment. See, e.g., *Wind Colebrook South, LLC* v. *Colebrook*, 344 Conn. 150, 165 and n.14, 278 A.3d 442 (2022) ("[when] a particular enumeration is followed by general descriptive words, the latter will be understood as limited in their scope to . . . things of the same general kind or character as those specified in the particular enumeration" (internal quotation marks omitted)).

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

by an in-network health care provider . . . .” General Statutes § 38a-477aa (b) (2). That is, does this statutory language require the deductible to be calculated in reference to a theoretical, in-network cost that might have been charged, or does it require the deductible to be calculated on the basis of the insured’s in-network cost sharing expenses under its policy but with reference to the actual charge for the out-of-network services? To better crystallize the question, the District Court posed the following hypothetical.

An insured has a $1000 deductible for in-network emergency care and a $5000 deductible for out-of-network emergency care. She visits an emergency room during a medical emergency and receives out-of-network care. The in-network fee for the procedure would be $500, and the greatest of three amounts in this instance, would be the usual, customary and reasonable rate for such services, which is $1500. The question is, how much of the $1500 fee is the carrier’s responsibility and how much is the insured’s responsibility? See *NEMS, PLLC* v. *Harvard Pilgrim Health Care of Connecticut, Inc.*, supra, 680 F. Supp. 3d 164–65.

Under the plaintiff’s reading of the statute, the insured can be required to pay only $500. That is, the insured’s liability for the out-of-network services would be capped, not solely by the maximum allowable in-network deductible of $1000 as applied to those services, but also by the maximum allowable deductible, as applied to the in-network cost of the services.

Under the defendant’s reading of the statute, the carrier would impose the in-network deductible of $1000, regardless of whether the insured obtains emergency care in network or out of network. The only difference would be that the insured would exhaust that full $1000 deductible by obtaining out-of-network care, whereas she would have exhausted only one-half of the deduct-

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

ible, $500, had she stayed in network. What would be prohibited, under the defendant's reading of the statute, would be the application of the $5000 deductible to the out-of-network services. The imposition of that cost sharing amount on the insured would violate the statute's prohibition against imposing "a coinsurance, copayment, deductible or other out-of-pocket expense that is greater than the coinsurance, copayment, deductible or other out-of-pocket expense that would be imposed if such emergency services were rendered by an in-network health care provider . . . ." General Statutes § 38a-477aa (b) (2).

One way to think about the parties' dispute, then, is whether the legislature intended to limit the deductible, copayment, etc., to that which would be imposed based on the in-network rate for the emergency care, or to that which would be imposed based on the maximum in-network cost sharing permitted under the insured's policy. For the following reasons, we find the latter reading more persuasive.

First, the meaning of the phrase "the coinsurance, copayment, deductible or other out-of-pocket expense that would be imposed if such emergency services were rendered by an in-network health care provider"; General Statutes § 38a-477aa (b) (2); presents a question of statutory interpretation, guided by established principles for discerning legislative intent. See, e.g., *Fay* v. *Merrill*, 336 Conn. 432, 446, 246 A.3d 970 (2020) (describing plain meaning rule, as set forth in § 1-2z, and principles for discerning legislative intent). The phrase "such emergency services" refers back to the phrase "emergency services rendered to an insured by an out-of-network health care provider . . . ." General Statutes § 38a-477a (b) (2). Section 38a-477aa (b) (3) (A) instructs us that the cost of services rendered by an out-of-network provider is set according to the greatest of three amounts. The logical reading of § 38a-477aa

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

(b) (2), therefore, is that the phrase "coinsurance, copayment, deductible or other out-of-pocket expense that would be imposed" is applied against the greatest of three amounts, as if an in-network provider had rendered the out-of-network services. That reading, that the applicable cost sharing amount of the insured is applied to the greatest of three amounts, calls into question the plaintiff's reading, which would require the application of the insured's cost sharing obligation to a hypothetical in-network cost of the services.

Second, the District Court's hypothetical assumed that the in-network rate for care would have been $500. See *NEMS, PLLC* v. *Harvard Pilgrim Health Care of Connecticut, Inc.*, supra, 680 F. Supp. 3d 164–65. The flaw in that assumption is key to our second point. In fact, there is no one, uniform in-network rate for any particular treatment. The parties have stipulated that carriers such as the defendant negotiate different in-network rates with different providers, presumably on the basis of their relative size and bargaining power, among other factors. The plaintiff's theory that § 38a-477aa (b) (2) caps an insured's contribution at the "in-network" rate only makes sense, then, if there is one established in-network rate to serve as a benchmark.

The plaintiff appears to recognize this problem, but we are not persuaded that its proposed solution is correct. The plaintiff posits that "there are at least three available avenues to determine the in-network rate: the median in-network rate of that insurer for that service in that geographical area, the mean in-network rate of that insurer for that service in that geographical area, or the in-network rate under the insured's health-care plan." Each of those methods of calculating the in-network rate may yield a different result. The plain language of the statute does not support a determination that the legislature included, within § 38a-477aa (b) (2), an unstated requirement that the carrier calculate

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

an undefined, in-network rate, one that the plaintiff itself concedes will vary depending on which of several plausible calculation methods is employed. The plaintiff's interpretation would require us to engage in significant gap filling by reading words into the statute in a manner contrary to standard principles of statutory construction.[14] See, e.g., *Ghent* v. *Planning Commission*, 219 Conn. 511, 515, 594 A.2d 5 (1991) ("we may not read into clearly expressed legislation provisions [that] do not find expression in its words" (internal quotation marks omitted)).

Third, and relatedly, the plaintiff's interpretation of § 38a-477aa (b) (2) is incompatible with the very definition of a deductible and would yield absurd or unworkable results. See General Statutes § 1-2z. Specifically, the term "deductible" is defined as, "[u]nder an insurance policy, the portion of the loss to be borne by the insured *before* the insurer becomes liable for the payment." (Emphasis added.) Black's Law Dictionary (10th Ed. 2014) p. 501; see also General Statutes § 17b-290 (7) (defining "deductible" to mean "the amount of out-of-pocket expenses that would be paid for health services on behalf of a member *before* becoming payable by the insurer" (emphasis added)). Under the plaintiff's analysis of the District Court's hypothetical, § 38a-

---

[14] We note that other states that have enacted surprise billing laws consistent with the plaintiff's interpretation have specified how the insured's financial burden is to be calculated. For example, § 4303-C (2) (A) of title 24-A of the Maine Statutes provides in relevant part: "A carrier shall require an enrollee to pay only the applicable coinsurance, copayment, deductible or other out-of-pocket expense that would be imposed for health care services if the services were rendered by a network provider. For an enrollee subject to coinsurance, the carrier shall calculate the coinsurance amount based on the median network rate for that health care service . . . ." Me. Rev. Stat. Ann. tit. 24-A, § 4303-C (2) (A) (Cum. Supp. 2024). The fact that the Maine legislature specified a means of calculating the imputed in-network rate solely for the purpose of coinsurance implies that cost sharing for deductibles and copayments is to be applied consistently with the defendant's interpretation of the surprise billing law.

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

477aa (b) (2) would require that the carrier begin paying for the insured's treatments after the insured has contributed only $500 out-of-pocket, even though one-half of her annual $1000 deductible remain unexhausted. That reading would conflict with the definition of a deductible and would, effectively, rewrite insurance policies so that each insured has, in essence, multiple different deductibles, each tailored to the imputed cost of different treatments. Either way, we see no indication that this was the intent of the legislature.

Finally, even if we were to conclude that the statutory language was ambiguous, any statutory ambiguity is resolved by referring to the legislative history of § 38a-477aa (b) (2). Statements in the legislative history support reading the statute as applying an insured's in-network cost share to the greatest of three amounts for emergency services. The primary purpose of the surprise billing law is to spare consumers the unwelcome surprise they experience when receiving an unexpectedly large medical bill after an unplanned and, often, unintentional visit to an out-of-network provider. As Representative Ritter explained, "[T]he New York Times did an exposé on . . . patients hit with, like, $15,000 bills. Surprise. That's where the name comes from. It's a bad surprise, and we tried to make that better." 58 H.R. Proc., supra, pp. 6715–16; see also id., p. 6717, remarks of Representative Prasad Srinivasan ("[The bill] definitely takes away the surprise element, which is a good thing. . . . [T]he whole purpose of the bill is to take away, for the consumer, that . . . surprise component . . . .").

The surprise that the statute guards against is that of an unexpectedly large medical bill, which is addressed under § 38a-477aa (b) (3) (A) and the greatest of three amounts. There is no suggestion in the legislative history that the statute was intended to transfer to carriers the out-of-pocket expenses that are ordinarily paid by

NEMS, PLLC *v.* Harvard Pilgrim Health Care of Connecticut, Inc.

insureds. There is no surprise attached to an insured learning, after receiving out-of-network emergency treatment, that she is responsible for paying her full in-network copayment or deductible. We see nothing in the legislative history to suggest that the statute was intended to apply an insured's out-of-pocket expenses to some standard (or mean or median) in-network fee for services in her geographical area, and we will not engage in such extensive gap filling, absent some indication that the legislature intended such an approach.[15]

All three certified questions are answered in the negative.

No costs shall be taxed in this court to either party.

In this opinion the other justices concurred.

––––––––––––––––––

[15] The plaintiff contends that the legislative history reinforces its interpretation of the statute. Specifically, the plaintiff relies on testimony that Senator Martin M. Looney presented before the Committee on Insurance and Real Estate with respect to a different version of the legislation. Senator Looney testified that, "[u]nder this [l]egislation, a patient receiving emergency medical services would not be required to pay more than the amount the patient would normally pay for in-network care." Conn. Joint Standing Committee Hearings, Insurance and Real Estate, Pt. 5, 2015 Sess., p. 29.

We do not read Senator Looney's testimony to unequivocally support the plaintiff's position. First, his statements before a hearing committee about a different bill is of questionable relevance. More important, Senator Looney's testimony does not address the precise issue before this court and is compatible with the interpretations of the statute advanced by both parties. Although his testimony could be read to support the plaintiff's view, Senator Looney's reference to "the amount the patient would normally pay for in-network care"; id.; could just as well refer to the patient's standard in-network deductible, copayment, and coinsurance, as applied to the greatest of three amounts for the cost of services.